FILED

09/16/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0268

DA 18-0268

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 237

STATE OF MONTANA,

Plaintiff and Appellee,

v.

CHRIS ARTHUR CHRISTENSEN,

Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-15-171
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Joshua S. Van de Wetering, Van de Wetering Law Offices,
Missoula, Montana

Laura Reed, Attorney at Law, Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

Bill Fulbright, Ravalli County Attorney, Thorin Geist, Deputy County
Attorney, Hamilton, Montana

Submitted on Briefs:  April 1, 2020
Decided:  September 16, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Chris Arthur Christensen appeals a judgment following a jury trial in Montana's Twenty-First Judicial District Court, in which Christensen was found guilty of two counts of Negligent Homicide, felonies, in violation of § 45-5-104, MCA; nine counts of Criminal Endangerment, felonies, in violation of § 45-5-207, MCA; and eleven counts of Criminal Distribution of Dangerous Drugs, felonies, in violation of § 45-9-101, MCA. We affirm in part and reverse in part.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether the State proved beyond a reasonable doubt that Christensen committed Criminal Distribution of Dangerous Drugs with respect to eleven patients.*

*Issue Two: Whether the State proved beyond a reasonable doubt that Christensen committed Criminal Endangerment as to his treatment of nine patients.*

*Issue Three: Whether the State proved beyond a reasonable doubt that Christensen committed Negligent Homicide for the overdose deaths of Kara Philbrick and Gregg Griffin.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Christensen is a general physician who has practiced in California, Washington, Idaho, and most recently, Montana. Although Christensen is not a pain specialist, he considers himself to have a special interest in managing chronic pain.[1] In 1992,

---

[1] Chronic pain is defined as "a state in which pain persists beyond the usual course of an acute disease or healing of an injury, or that may or may not be associated with an acute or chronic pathologic process that causes continuous or intermittent pain over months or years." Montana Board of Medical Examiners, *Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Sec. III, at *4 (Mar. 27, 2009).

Christensen began operating a general practice in Kellogg, Idaho, and commenced treating more chronic pain patients. Christensen prescribed to patients narcotics like Methadone, a long-acting synthetic opioid agonist, and Dilaudid (hydromorphone hydrochloride), a short-acting opioid analgesic that modifies patients' psychologic interpretation of and physiologic response to pain.[2] Christensen often administered prescriptions for opioids in conjunction with benzodiazepines like Diazepam (Valium), Lorazepam (Ativan), and Alprazolam (Xanax), used for treating anxiety, muscle spasms, and depression. Benzodiazepines are classified as Schedule IV controlled substances pursuant to the DEA. Scheduled narcotics may only be prescribed by a physician or other medical professional with a DEA license. *See, e.g.*, 21 U.S.C. § 829.

¶4 In 1997, the Idaho Board of Medicine filed a complaint against Christensen, alleging he prescribed excessive and inordinate amounts of controlled substances, that he prescribed these drugs to addicted persons, and that he was operating outside the accepted standards of medical practice established by the Idaho medical community. In 1998, Christensen entered into a stipulation with the Board, agreeing to certain restrictions on his medical license, prohibiting Christensen from writing prescriptions for controlled substances to chronic pain patients for longer than 90 days. Christensen did not admit any liability or wrongdoing.

---

[2] These drugs are classified as Schedule II narcotics pursuant to the Drug Enforcement Agency ("DEA"), the most potent medications that possess a known medical use in the United States. The DEA has recognized that these drugs have a high potential for abuse which may lead to severe psychological or physical dependence.

¶5     In 2000 and 2001, the Idaho Board of Medicine filed two additional petitions alleging Christensen violated his 1998 stipulation by continuing to prescribe controlled substances in contravention of the restrictions placed on his medical license.  The second petition further alleged that Christensen's prescriptions resulted in the overdose deaths of at least five of his patients and at least six patient hospitalizations.  Christensen again did not admit any liability but agreed to surrender his medical license for two years and to probation for five years if in the future he decided to reopen an Idaho practice.  Christensen further agreed to a stipulation prohibiting him from writing prescriptions for controlled substances longer than 30 days and that he would engage in at least six months of school-specific education regarding chronic pain treatment before he could resume practice in Idaho.[3]

¶6     Christensen did not return to practice in Idaho, but in 2005, opened Big Creek Family Medicine, a general practice, in Victor, Montana.  Christensen's medical license was active and unrestricted, but he was prohibited from writing prescriptions for controlled substances because he had not yet reacquired his DEA license.  Christensen eventually moved his practice to Florence, Montana.  On August 26, 2011, Christensen was issued a

---

[3] In 2006, Christensen was also indicted for criminal charges in United States District Court for the District of Idaho for the death of one of his patients, alleging that Christensen knowingly and intentionally distributed Schedule II and Schedule IV controlled substances outside the scope of a professional practice and for no legitimate medical purpose in violation of U.S.C. § 841(a)(1). *See United States v. Christensen*, No. CR-06-017-N-EJL, 2008 U.S. Dist. LEXIS 102370, at *2 (D. Id. Dec. 18, 2008).  In 2009, the case was tried in Idaho and resulted in a hung jury.  In 2010, the case was retried, and Christensen was acquitted.

new DEA license. Christensen did not accept insurance payments for services and instead accepted payment by cash or check.

¶7 In 2012, approximately six months after Christensen reacquired his DEA prescription-writing authority, pharmacists in the surrounding areas reported concerns to the Ravalli County Sheriff's Office regarding large opioid prescriptions issued from Christensen. On April 1, 2014, the Missoula High Intensity Drug Trafficking Area Task Force ("Task Force") obtained three search warrants from Montana's Twenty-First Judicial District Court, authorizing a search of Christensen's business and residence for evidence related to criminal distribution of dangerous drugs.

¶8 The Task Force thereafter consulted with the Ravalli County Attorney's Office and selected eleven patients among approximately 4,700 patients treated by Christensen. These patients included Kara Philbrick and Gregg Griffin, who each died from prescription drug overdoses shortly after obtaining prescriptions from Christensen, as well as Heather Sutherland, Daniel Lieberg, Erica Cummings, Jennifer Hiscoe, Jacqueline Golden, Michelle Jessop, Paul Peterson, Todd Gore, and Ryan Marchand. The County Attorney's Office alleged that between July 1, 2011, and April 1, 2014, Christensen distributed dangerous drugs outside the course of a professional practice to these eleven patients.

¶9     On October 19, 2017, the State filed the final Amended Information in Montana's Twenty-First Judicial District Court,[4] accusing Christensen of two counts of Negligent Homicide, felonies, in violation of § 45-5-104, MCA, for the deaths of Philbrick and Griffin; nine counts of Criminal Endangerment, felonies, in violation of § 45-5-207, MCA, for nine patients; and eleven counts of Criminal Distribution of Dangerous Drugs, felonies, in violation of § 45-9-101, MCA.

¶10    A jury trial was held October 23, 2017, through November 20, 2017.  Christensen was found guilty on all counts.  On March 8, 2018, the District Court issued its Judgment and Commitment, sentencing Christensen to 20 years in the Montana State Prison with ten years suspended.  The District Court stayed Christensen's sentence until resolution of his appeal to the Montana Supreme Court.  Christensen appeals.  Additional facts specific to Christensen's arguments are included below.[5]

## STANDARDS OF REVIEW

¶11    A grant or denial of a motion to dismiss in a criminal case is a question of law which we review de novo.  *State v. Ashmore*, 2008 MT 14, ¶ 7, 341 Mont. 131, 176 P.3d 1022. A district court's denial of a motion to dismiss based on insufficiency of the evidence is

---

[4] On August 19, 2015, the State filed an Information in Montana's Twenty-First Judicial District Court, charging Christensen with two counts of Negligent Homicide, nine counts of Criminal Endangerment, 306 counts of Criminal Distribution of Dangerous Drugs in violation of § 45-9-101(2), MCA; an additional 82 counts of Criminal Distribution of Dangerous Drugs, in violation of § 45-9-101(4), MCA; and one count of Criminal Possession of Dangerous Drugs.

[5] In addition to the arguments below, Christensen argues on appeal that the District Court improperly imposed a fine at sentencing because he is "effectively bankrupt."  However, in its Judgment and Commitment, the District Court did not impose a fine.  Christensen's argument is a non-issue and we therefore do not address its merits on appeal.

reviewed for an abuse of discretion. *State v. Miller*, 1998 MT 177, ¶ 21, 290 Mont. 97, 966 P.2d 721. We review de novo whether sufficient evidence supports a conviction. *State v. Polak*, 2018 MT 174, ¶ 14, 392 Mont. 90, 422 P.3d 112. When reviewing a challenge to the sufficiency of the evidence, this Court determines whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. LaMere*, 2003 MT 49, ¶ 13, 314 Mont. 326, 67 P.3d 192.

¶12 Generally, this Court will not address issues raised for the first time on appeal. *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694. However, this Court possesses the inherent authority to invoke plain error review for claimed errors that implicate a criminal defendant's fundamental constitutional rights when failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79.

¶13 We review de novo a District Court's interpretation of statute, determining whether the trial court's interpretation is correct. *State v. Sutton*, 2018 MT 143, ¶ 11, 391 Mont. 485, 419 P.3d 1201. A statute is presumed constitutional unless it conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt. *State v. Stock*, 2011 MT 131, ¶ 19, 361 Mont. 1, 256 P.3d 899. The party challenging the constitutionality of a statute bears the burden of proof; if any doubt exists, it must be resolved in favor of the statute. *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 12, 382 Mont. 256, 368 P.3d 1131.

¶14    A district court has broad discretion in determining whether evidence is relevant and admissible.  *State v. Duffy*, 2000 MT 186, ¶ 43, 300 Mont. 381, 6 P.3d 453.  We review a district court's evidentiary rulings, including the admissibility of character evidence, for an abuse of discretion.  *State v. Kaarma*, 2017 MT 24, ¶ 11, 386 Mont. 243, 390 P.3d 609 (citing *State v. Huerta*, 285 Mont. 245, 254, 947 P.2d 483, 489 (1997)).

¶15    Jury instructions in a criminal case are reviewed for an abuse of discretion to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case.  *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217. To constitute reversible error, any mistake in instructing the jury must prejudicially affect the defendant's substantial rights.  *Kaarma*, ¶ 7.

## DISCUSSION

¶16    *Issue One: Whether the State proved beyond a reasonable doubt that Christensen committed Criminal Distribution of Dangerous Drugs with respect to eleven patients.*

¶17    Christensen raises multiple issues regarding his prosecution and conviction for criminal distribution of dangerous drugs.  Before discussing the merits as to the issues raised, we provide a chronological factual summary of relevant pretrial motions, testimony presented at trial, evidentiary issues, and jury instructions.

Pretrial Motions

¶18    On March 21, 2016, the State filed its first pretrial motion for an order confirming how the offense of Criminal Distribution of Dangerous Drugs, § 45-9-101, MCA, would be interpreted at trial, requesting the court adopt the State's proposed jury instructions with regard to this offense.  The State's motion asserted that pursuant to § 45-9-101(1), MCA,

the writing of a prescription constitutes a "sale, barter, exchange, or giving away of dangerous drugs," and the professional practice exemption for physicians and medical professionals, pursuant to § 45-9-101(6), MCA, was inapplicable because Christensen was acting outside the course of his professional practice. In support of its motion and proposed jury instructions, the State relied on a Ninth Circuit Court of Appeals case, *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006).

¶19 Christensen, at the time appearing pro se, did not file a timely answer brief responding to the State's motion, but did file a motion to stay the proceeding until he obtained appropriate legal representation. On July 25, 2016, the court issued an opinion and order on multiple pretrial motions, noting that Christensen's failure to file an answer brief within the time allowed constituted an admission that the motion was well taken. The court granted the State's motion on the proposed jury instructions for criminal distribution, finding the proposed instructions correctly instructed the jury on the law.

¶20 On January 18, 2017, Christensen filed a motion to dismiss all charges. With respect to the drug distribution charges, Christensen asserted that Montana's criminal distribution statute, § 45-9-101, MCA, did not prohibit "prescribing" of dangerous drugs, and §§ 45-9-101(6) and 102(8), MCA, exempted the actions of physicians acting in the course of a professional practice from prosecution. On April 5, 2017, the District Court issued an order denying Christensen's motion to dismiss. The court also held that it already ruled on the issue when it granted the State's motion for proposed jury instructions.

¶21 On August 9, 2017, the District Court issued its first set of trial stipulations. The State and Christensen agreed to jury instructions prohibiting each party from discussing

9

potential sentences that may be imposed in this case. On September 8, 2017, the State filed a motion in limine seeking in part to preclude Christensen from presenting testimony or evidence from 28 former patients regarding personal medical experiences with Christensen. On September 22, 2017, Christensen filed a response to the State's motion in limine, arguing that M. R. Evid. 406, Habit and Routine Practice, permitted admission of such testimony because the issue concerned his prescribing practices. On the same date, Christensen also filed a motion in limine, seeking in part to exclude from trial as irrelevant (1) any reference to criminal charges in Idaho for which he stood trial and was acquitted and any reference to events underlying the charges and acquittal; and (2) any reference to the Idaho Medical Board's actions taken against Christensen.

¶22     On October 16, 2017, the District Court issued an order granting the State's motion in limine to preclude testimony or evidence of Christensen's former patients, finding the proposed testimony did not fall within M. R. Evid. 406(b) as evidence of a routine practice and was irrelevant as to Christensen's treatment of the eleven patients. On October 18, 2017, the court granted Christensen's motion in limine to preclude any reference to criminal charges in Idaho except for purposes of impeachment and rebuttal. However, the court denied Christensen's motion to preclude any reference to the actions taken by the Idaho Medical Board against Christensen, finding such evidence was admissible for non-propensity purposes to show knowledge and absence of a mistake or accident, and that this evidence was not unfairly prejudicial.

Trial

*Opening Statements*

¶23    In opening statements, the State referenced the Idaho Board of Medicine's complaints filed against Christensen stemming from allegations that Christensen overprescribed opioids outside the accepted standards of medical practice and that at least five of his patients died of a drug overdose and another six had been hospitalized. The State also explained that as to both complaints, "[Christensen] never admitted any liability[,]" but that "he did agree to surrender his medical license for a period of two years, and he agreed that if he was going to come back to Idaho that he would be on probation for five years."

*State's Case*

Idaho Charges

¶24    On October 26, 2017, in regard to scheduled testimony from Jean Uranga, the attorney representing the Idaho Board of Medicine at the time Christensen was investigated in Idaho, the court conferred with each party regarding the admissibility of the proposed testimony under M. R. Evid. 404(b). Christensen's counsel objected to the introduction of allegations contained in the Idaho Board cases, and specifically, the introduction of the complaints themselves as exhibits as irrelevant and unduly prejudicial. The State countered that the evidence was admissible under M. R. Evid. 404(b) to show Christensen was on notice for the crimes in the present case. Christensen's counsel acknowledged that questioning as to the underlying allegations was permissible to some extent, that he was not surprised by the State's efforts to admit this evidence, and acknowledged the State

11

provided him this proposed evidence before trial. The court ultimately prohibited the State from introducing the complaints as exhibits and limited the State's questioning of Uranga to only general allegations in the complaint and the number of patients involved in the Idaho investigation, while barring detailed questioning as to specifics.

¶25     Uranga testified that Christensen was investigated by the Idaho Board of Medicine in 1997 for  allegedly violating community standards of care in Idaho for providing narcotics to patients without treating their primary conditions, not conducting physical examinations, not offering referrals, and providing narcotics to patients with drug addictions. Uranga further testified that in 2000, the Board filed a petition, alleging that Christensen overprescribed opioids to 28 patients, 23 who received prescriptions for opioids and benzodiazepines, and that the Idaho Board concurrently filed an immediate suspension of his prescription-writing authority for intentionally, knowingly, flagrantly, and repeatedly violating the stipulation and order signed with the Board. Uranga testified that Christensen did not admit any liability but agreed to surrender his Idaho license to practice medicine and his ability to prescribe any controlled substances for two years.

Chronic Pain and Opioid Risks

¶26  The State presented extensive expert testimony from Dr. Ajay Wasan,[6] Dr. Brett Bender,[7] Dr. Vince Colucci,[8] Dr. Patrick Danaher,[9] and Dr. Elena Furrow[10] as to the nature of "chronic pain" and the risks and efficacy of treating chronic pain with opioids. Experts testified that chronic pain is the result of prolonged pain which causes the nervous system to act in a negative, dysfunctional state and triggers a negative emotional interpretation of that pain. Experts further testified that opioids cannot serve as the dominant treatment for chronic pain because they may cause increased pain symptoms, carry a high risk of addiction, and offer limited effectiveness. Experts also testified that opioids may cause dangerous interference with electrical conduction signals in the heart and are subject to build-up in the system, increasing the risk of respiratory depression, sleep apnea, and death, particularly when taken in combination with benzodiazepines.

Standard of Care

¶27  At trial, the State introduced into evidence the 2009 Montana Board of Medical Examiners Guidelines for the Use of Controlled Substances for the Treatment of Pain.[11]

---

[6] Dr. Wasan is a medical doctor, pain specialist, and psychiatrist at the University of Pittsburgh Medical Center.

[7] Dr. Bender treats chronic spine and pain patients at St. Patrick's Hospital in Missoula.

[8] Dr. Colucci is a doctor of pharmacy operating a professional practice at St. Patrick's Hospital.

[9] Dr. Danaher, a doctor of osteopathic medicine ("DO") licensed to practice in Montana, was a blind expert in the case and did not review any of the patient medical files prior to testifying.

[10] Dr. Furrow is a family physician who operates a training program for addiction and opioid dependence in Missoula.

[11] Dr. Bender testified on cross-examination that these guidelines first became prominent around 2005 and that he refers to these guidelines when treating chronic pain patients. Dr. Bender

13

Section I of these guidelines provides in part: "the inappropriate treatment of pain includes nontreatment, undertreatment, overtreatment, and the continued use of ineffective treatments[,]" and, "All physicians should become knowledgeable about assessing patients' pain and effective methods of pain treatment, as well as statutory requirements for prescribing controlled substances." Section I also provides, "[T]he Board expects that physicians incorporate safeguards into their practices to minimize the potential for the abuse and diversion of controlled substances."

¶28 In addition, Dr. Bender, Dr. Danaher, Dr. Ravitz,[12] Dr. Furrow, and Dr. Wasan testified as to standards of practice for physicians when treating chronic pain patients. These experts identified four primary guidelines to which physicians must adhere when treating chronic pain patients, including: (1) comprehensive initial assessments through diagnostic tests and review of medical records to diagnose the underlying cause of pain and identify risk factors of opioid treatment; (2) providing holistic treatment plans; (3) careful patient monitoring; and (4) comprehensive documentation.

    *a. Initial Assessment*

¶29 Section II of Montana's Medical Board guidelines provides a list of criteria for evaluating a physician's treatment of pain, requiring physicians to obtain patients' medical histories and physical examinations, evaluate and document this information in patients'

---

also testified that the Center for Disease Control published guidelines in 2016, after Christensen's practice closed, stating that physicians should not prescribe more than 90 morphine milligram equivalents of opioids.

[12] Eric Ravitz, DO, is a family physician practicing in Missoula.

14

medical records, and document current and past treatments for pain, underlying diseases or medical conditions, and histories of substance abuse. Similarly, Dr. Danaher, Dr. Bender, and Dr. Wasan testified that in their own practices, prior to administering medications, patients must undergo comprehensive initial evaluations, which includes review of past medical records, patient interviews, physical examinations, and imaging studies such as X-rays, CT scans, CAT scans, and MRIs. Based on this collective information, treating physicians must identify and accurately diagnose the underlying cause of chronic pain. Dr. Danaher and Dr. Wasan also testified that patients never receive opioids the first visit but must first submit to psychological assessments and other referrals to identify any red flags suggesting the possibility of opioid abuse. If opioids are determined as a potential source of treatment, patients must undergo an electrocardiogram ("EKG") during the initial assessment phase and at least every year to ensure that opioids will not have a negative effect on heart and respiratory health.

### b. Treatment Plan

¶30 Section II of Montana's Medical Board guidelines further provides that physicians should create a treatment plan outlining treatment objectives and are encouraged to discuss with patients the risks of using controlled substances. Physicians are also encouraged to use a written agreement outlining patient responsibilities in instances which a patient is at a high risk for substance abuse. Dr. Danaher, Dr. Wasan, and Dr. Bender explained that this treatment plan must be catered specifically to the etiology of the patient based on information acquired in the initial assessment. Dr. Wasan testified that the standard of care for this treatment plan is "multimodal," requiring a physician to utilize four basic

15

methodologies—(1) medications, and specifically, non-opioid medications as much as possible, (2) injections such as nerve blocks[13] and prolotherapy,[14] (3) physical therapy, and (4) psychiatric care to combat depression and anxiety.

¶31     Dr. Danaher testified that a treatment plan utilizing only opioid and benzodiazepine medications does not meet the standard of care for the pain community due to risks of abuse.  Dr. Bender and Dr. Ravitz testified that if the treatment plan involves the use of opioid medications, physicians must explain instructions and warnings, and utilize a consent form, known as the "opioid agreement," detailing the risks and potential side effects of opioid use.  Dr. Wasan stated that this opioid agreement is the "cornerstone" of good opioid care and is critical to the success of the treatment plan.

   *c. Monitoring*

¶32     Section II of Montana's Medical Board guidelines also encourages physicians to periodically review pain treatment procedures, use objective evidence to monitor treatments, and routinely consider other therapeutic treatments available, including referrals for additional evaluations, particularly for patients at risk of opioid misuse. Similarly, Dr. Wasan, Dr. Danaher, and Dr. Bender all testified that the treatment plan must be revised at each successive meeting to effectively manage pain and ensure treatment objectives are being targeted.  Once opioids are prescribed, careful monitoring and short

---

[13] Nerve blocks are medications often administered as injections to block pain from nerve receptors.

[14] Prolotherapy is a procedure in which a natural irritant is injected into the soft tissue of an injured joint to stimulate the body's healing response.

16

interval follow ups are necessary to determine patient responses to medications and identify any aberrant behavior, utilized through random urine drug screens, pill counts, and restrictions to filling scripts at only one pharmacy. Dr. Wasan testified that if a patient is overusing or misusing opioid prescriptions, it may indicate that the medications are not working effectively to treat pain and are instead being used to feed tolerance or addiction. Dr. Wasan stated that in such instances, physicians must consider moving away from using opioid treatments, perform additional assessments, and modify treatment plans.

### d. Documentation

¶33    Section II of Montana's Medical Board guidelines further advises physicians to maintain accurate and complete records of: medical histories; physical examinations; diagnostic and lab results; evaluations and consultations; treatment objectives; discussions of risks and benefits of treatments; informed consent obtained; treatments; medications prescribed, including date, type, dosage, and quantity; instructions and agreements for using medications; and periodic reviews. Dr. Wasan and Dr. Ravitz testified that it is within the standards generally accepted in the medical community to maintain comprehensive summaries in patient files when treating chronic pain patients and is "crucial" to guide follow-up treatments. Dr. Ravitz explained that in classical medical documentation, he utilizes S.O.A.P. notes in patient files—an acronym referring to four benchmarks of documentation: Subjective notes, such as patient descriptions of pain and symptoms; Objective notes regarding diagnostic tests performed, such as vital signs, temperature, blood pressure, physical examinations, and imaging results; Assessment, referring to the physician's valuation of both subjective and objective findings that

17

correlates to the physician's ultimate diagnosis as to the underlying cause of pain; and Plan, referring to the corresponding treatment plan.

Christensen's Treatment of Patients

¶34 The jury heard testimony from all nine surviving patients[15] regarding treatment received from Christensen. Dr. Ravitz, Kara Philbrick's treating physician prior to her treatment with Christensen, and Jerry Price, Philbrick's husband, offered testimony on behalf of Philbrick. Sharon Griffin, Gregg Griffin's mother, Ryan Marchand, Christensen's risk assessment management and addiction counselor, and Dr. Furrow, Griffin's former treating physician, testified on behalf of Griffin.

    a. Addiction Disclosures

¶35 Cummings, Golden, Jessop, and Gore all testified that they heard about Christensen by word-of-mouth, that you could "basically get anything," and he "prescribed out the medications that you asked for." Cummings, Golden, Hiscoe, Lieberg, Sutherland, Jessop, Peterson, and Gore all testified that they were already suffering from drug or opioid addictions at the time they first saw Christensen. Golden, Hiscoe, Lieberg, Jessop, Peterson, and Gore did not explicitly disclose their addictions to Christensen during their

---

[15] Erica Cummings, the State's first witness and a former patient of Christensen, was prosecuted in a separate case for criminal distribution of dangerous drugs and negligent homicide. Cummings ultimately pleaded guilty to criminal distribution and criminal endangerment. As part of her plea agreement with the State, in exchange for dropping the negligent homicide charges, she agreed to testify against Christensen in this case. During cross-examination, in an effort to show bias, Christensen's counsel sought to impeach Cummings based on the penalties she would have potentially received if she did not agree to testify against Christensen. The State objected. The court sustained the objection, explaining that the line of questioning "suggest[s] to the jury what penalties [Christensen] might be facing, and that would be improper." Christensen's counsel was permitted to question her about her actual sentence received based on the plea agreement.

first or subsequent appointments. However, Ryan Marchand testified that he performed a risk assessment with Lieberg and noted that he "was pretty open about the issues that he's had in his past[,]" and "it was pretty obvious that he would continue to struggle, to use chemicals to deal with emotional issues as they arose . . . ."

¶36 Sutherland testified that she disclosed to Christensen on her initial visit in 2005 that she was getting opioid withdrawal counseling and in 2012, after moving back to Montana, testified she told Christensen she was on a Suboxone[16] program. Marchand testified that he performed a risk assessment on Sutherland, that Sutherland was open about her struggles with addiction, and that she told Marchand that her grandmother had to keep her medications locked up. Similarly, Cummings testified that she told Christensen during her first meeting that she was addicted to Methadone. Marchand testified he performed a risk assessment for Cummings and noted on her assessment form that she posed a "severe risk" with using opioid therapy.

¶37 Both deceased patients, Griffin and Philbrick, also had long histories with substance abuse at the time they saw Christensen. Sharon Griffin and Dr. Furrow testified that Griffin had a long history with Methadone abuse, previously served a stint in a drug rehabilitation center in Kalispell and was treated with Suboxone therapy for eight years prior to seeing Christensen because of his Methadone addiction. Dr. Ravitz and Price testified that Philbrick was an alcoholic, was routinely drinking large quantities of vodka at the time she

---

[16] Suboxone (buprenorphine and naloxone) is a DEA Schedule III narcotic used to treat opioid addiction.

received treatment from Dr. Ravitz, and that in 2006, Philbrick overdosed from prescription drugs.

¶38    Price testified that on March 13, 2013, he attended Philbrick's first and only meeting with Christensen.  Price testified Philbrick told Christensen that she was on Fentanyl, Zoloft, and Valium, and disclosed in her initial questionnaire that she used alcohol. Similarly, Dr. Furrow testified that while Griffin first obtained a Methadone prescription from Christensen on February 22, 2012, Griffin had previously met with Christensen in 2008 to obtain a medical marijuana card and indicated on a questionnaire that he was on Suboxone treatment.  On March 21, 2012, Marchand evaluated Griffin, and noted Griffin posed a "high risk" for opioid abuse and dependency, was a "high risk" for developing problems on long-term opioid therapy, and Marchand recommended "high monitoring." Marchand's notes also provided that Griffin was on Suboxone therapy and that Griffin wished to discuss further Suboxone treatment with Christensen.

### b. Legitimate Medical Issues

¶39    Trial testimony established that ten of the patients had legitimate pain at the time of their first appointments with Christensen.  Cummings was suffering from a hip injury; Peterson, a professional golfer, suffered from a knee problem; Golden reported that she suffered from rheumatoid arthritis in her hands; Hiscoe suffered from a degenerative bone disease, neck fusion, a bad shoulder, arthritis in her back, and depression stemming from her son's death; Lieberg suffered a back injury from falling down a flight of stairs; Sutherland was suffering from endometriosis and pain in her right hip; Gore suffered from

20

a back injury stemming from collegiate football and prior military service; and Marchand testified that he had a severe spinal cord injury from a mountaineering accident.

¶40    Sharon Griffin testified that Griffin suffered from a wrist injury from a nail gun, broke an ankle from a construction accident, and previously received an arthroscopic procedure for a knee injury.  Price testified that Philbrick had a back injury from falling off a horse when she was 12 and a misdiagnosed wrist injury.   Only Jessop testified that she was not in any pain at the time she went to see Christensen but did testify that in 1995 she suffered an injury to her throat from a barbed wire fence while riding an ATV.  Jessop testified she told Christensen that pain from this incident was the reason for her coming to Christensen.

### c. Initial Assessments

¶41    Many patients reported that meetings with Christensen, including initial appointments, were no longer than a few minutes to a half hour.  Christensen's preliminary examinations were very limited in nature or altogether nonexistent.  Cummings testified that he only had her touch her toes and "poked around" her back.  She also testified that he talked briefly about prolotherapy as an option but that she told him she was not interested. She testified that Christensen did not conduct any urine or blood tests, did not conduct an EKG, did not discuss the risk of opioid use, and did not recommend addiction or treatment counseling.  Similarly, Peterson testified that he only filled out one piece of paper at his first visit and listed his cause of pain as "chronic pain" and a family history of "fibromyalgia."  His first visit was only 10 minutes, and Christensen felt around his knees, performed no diagnostic tests, and diagnosed him with "chronic pain."   Christensen

21

purportedly told him he would treat his pain with pain pills, and offered no referrals for surgery, alternative treatments, and did not discuss chemical dependency.

¶42    Golden testified Christensen performed a cursory exam on her back by pushing on it and asked if it "hurt." He told her she should eventually do an MRI but never followed up on this suggestion. Christensen did not talk about the dangers or risks of opioid use, ask for medical records, or utilize blood draws or urine screens. Similarly, Hiscoe testified that Christensen did not perform any real physical exam or any diagnostic tests, discuss with her any diagnosis or offer alternative treatments, did not provide a chemical dependency evaluation, and the entire meeting was only 10 minutes.

¶43    Lieberg testified that Christensen met with him for only 20-25 minutes and performed a basic checkup. Christensen diagnosed Lieberg with "chronic pain," but only briefly examined his back and did not perform any imaging tests. Sutherland testified she received only one X-ray for pneumonia but did not receive one for her hip. Jessop said that she first saw Robin Rice, Christensen's physician assistant ("PA"), who explained pain management to her and told her she needed to get her medical records. She testified no diagnostic tests or imaging tests were conducted, there was no conversation about chemical dependency, or a discussion as to a treatment plan. Marchand testified that he brought in a binder with his past medical records for his first visit and provided a history of surgeries. He testified that Christensen briefly looked through some of these records and made some photocopies, but that Christensen did not conduct an in-depth physical examination.

¶44    Gore, a drug addict and drug dealer working in the Bakken oil fields in North Dakota, testified that he came to his first meeting with a faulty back brace and cane to

22

facilitate acquisition of prescription drugs. He previously had back surgery at a V.A. hospital in North Dakota, but he did not obtain his V.A. records until his third appointment. He was never asked to get a new MRI. Christensen only briefly checked his back and observed his scar. Price testified that Christensen did not review any of Philbrick's past medical records, that he did not sign any of her release records to obtain past medical records, that there was no physical exam aside from looking at her wrist, and that there was no blood tests or EKG performed.

### d. Prescriptions

¶45    All eleven patients received opioid prescriptions from Christensen on the first visit. Cummings testified that she left her first visit with Christensen for a prescription of 80 or 90 mg of Methadone per day, as well as a prescription for Dilaudid and Ativan. She testified that Christensen never discussed with her the risks of combining opioids with benzodiazepines. Christensen also asked her if she owed anyone Methadone. Peterson testified that he received a prescription for Dilaudid and Methadone at his first visit, that he was to take "as needed," and that Christensen did not explain the side effects of the prescriptions. Peterson testified that the quantity of his prescriptions went up "significantly" until he was eventually taking 14 pills per day, and that "I always felt I was prescribed way too much medication." Peterson was later prescribed Xanax for sleeplessness. He testified that Christensen never discussed the risks of taking opioids and benzodiazepines together or discussed the long-term effects of using these drugs. Christensen also never set a date for having to stop. Peterson testified that at least once,

Christensen used street slang to reference these drugs and referred to the street value of these drugs.

¶46 Golden testified that she received a prescription for three Methadone per day on her first visit and eventually received prescriptions for Xanax. She testified that Christensen never discussed the dangers or risks of opioid use or the risks of combining Methadone and Xanax. Hiscoe testified that she received prescriptions for Methadone, Hydromorphone, and Xanax from Christensen, and eventually also received Hydrocodone. Over time, she began receiving higher quantities of drugs until she was taking 100 mg of Methadone per day in addition to Hydromorphone, Dilaudid, and Xanax.

¶47 Lieberg testified that he received Hydrocodone on his first visit. Eventually, he received injections of prolotherapy on two separate occasions. Lieberg testified he later received prescriptions for Oxycodone, Fentanyl Patches, and Dilaudid. He testified that he paid in cash or traded manual labor for prescriptions. Lieberg testified that eventually he was taking 10 pills of 10 mg Hydrocodone in addition to 6 pills of 30 mg Oxycodone per day. Sharon Lieberg, a registered nurse for 47 years, testified that Lieberg received prescriptions on two separate occasions for 300 pills, and another for 180 pills. She testified that she had never seen prescriptions for drugs of that quantity prescribed before. Alarmed by these prescriptions, she met with Christensen and told him Lieberg had a history of drug abuse, bipolar disorder, and an autoimmune disorder. In response, Christensen prescribed Lieberg Fentanyl to help wean him off his prescriptions. Only days later, Christensen increased his Fentanyl prescription to 100 mg per day before eventually prescribing him most of the medications he was taking before.

24

¶48 Sutherland testified that in 2012, her first visit back to Christensen, she received a prescription for Methadone in lieu of Suboxone. Sutherland testified that she was eventually prescribed 1000 Methadone pills per prescription. For approximately nine months, she was instructed to take up to 600 mg of Methadone, eight to ten Dilaudid, and six Xanax per day, alongside medication for muscle spasms. Jessop testified that her first visit she told Christensen what medications worked for her pain and what she needed and "that's what I walked out with." She received prescriptions for Dilaudid, Xanax, Soma,[17] and eventually Methadone. She testified that the risks of these drugs were never explained. She testified at the highest point, she was taking 20 Dilaudid, four Methadone, and five or six Soma per day, in addition to a Methadone with each Dilaudid, plus a Xanax to go to bed. She also testified that on two separate occasions she received Adderall pills directly from Christensen.

¶49 Gore testified that he received Dilaudid on his first meeting with Christensen even though it was not requested. Eventually he was prescribed Xanax and Methadone. Marchand testified that he was prescribed Methadone and Dilaudid on his first visit with Christensen. He testified his Methadone and Dilaudid prescriptions were increased over time and eventually was also prescribed Xanax. Marchand said that Christensen did not discuss any risks associated with combining Xanax with opioids like Methadone and Dilaudid. Marchand was also eventually prescribed Adderall after he told Christensen he was having trouble staying awake and focusing due to his Methadone prescription.

---

[17] Soma (carisoprodol) is used as a muscle relaxant.

¶50    Price testified that at her first appointment, Philbrick asked Christensen for a prescription for Methadone at a specific amount and her request was granted.  He also prescribed Philbrick Dilaudid for "breakthrough pain"[18] and a medical marijuana certificate.  Dr. Ravitz testified Christensen's prescription indicated that Philbrick was supposed to increase her Methadone dosage from 30 mg to 90 mg per day over a six-day period.  Dr. Ravitz testified that he had prescribed Philbrick Fentanyl only days earlier.  Price testified that Christensen provided a four-day taper off the Fentanyl.  Price also testified that they went to the Osco drug pharmacy and had a hard time filling the Methadone prescription.  Price testified that on March 15, 2013, two days later, he found Philbrick dead.

¶51    Dr. Furrow testified that Griffin received Methadone from Christensen on his first visit.  She testified that Christensen did not contact her regarding Griffin's treatment.  On March 2, 2012, Griffin's second visit with Christensen, he received a prescription for 200 pills of Methadone in addition to Xanax and was to take 60 or 70 mg of Methadone per day.  On March 30, 2012, Griffin attended Big Creek Family Medicine; he did not have an actual appointment but obtained a refill of a prescription for 200 Methadone pills.  Sharon Griffin testified that on April 2, 2012, she found Griffin dead from a drug overdose.

    *e. Monitoring*

¶52    Patient testimony also reflected that Christensen's follow-up appointments were consistently brief, that Christensen rarely conducted follow-up tests or assessments, and

---

[18] Dr. Colucci testified that breakthrough pain refers to unexpected flare ups of pain that are often treated with short-acting opioids like Dilaudid.

26

often only refilled prescriptions. Cummings testified that Christensen never again performed any physical exams or diagnostic tests, never discussed goals to address her underlying hip pain, or a timeline for weaning off opioids. She testified that once Christensen offered her prolotherapy, but she declined. She testified that once Christensen performed a pill count and another time a urine test, which she failed for having unprescribed Adderall in her system. Christensen responded by providing her a prescription for Adderall. Cummings also testified that on another occasion she was required to meet with Marchand after a neighbor called Christensen and told him she was selling her pills. Christensen told her he did not have any reason for concern and did not make changes to her prescriptions. He also recommended Cummings only fill her prescriptions at a pharmacy in Corvallis, Montana, because it was the only pharmacy that would fill his prescriptions. Eventually she stopped seeing Christensen because she was arrested for criminal distribution of dangerous drugs and negligent homicide.

¶53 Peterson testified that follow-up visits with Christensen were shorter each time, that there were no additional physical exams or evaluations, and that follow-up appointments were used only to refill his prescriptions. He testified that Christensen never discussed a timeline to discontinue opioid treatment. He testified he was never subject to pill counts, urinalysis tests, and only once received an EKG, but did engage in physical therapy treatments at Christensen's office on two occasions. Peterson stated that within four weeks of treatment he believed he was addicted to opioids and feared overdosing. He testified he asked Christensen if he could begin to taper off opioids, but Christensen responded, "we

27

need to continue treatment as we are doing now." Peterson entered a drug rehabilitation program after Christensen's practice shut down.

¶54    Similarly, Golden testified Christensen never discussed alternatives to opioids, did not request past medical records, perform blood draws, or utilize urine tests, and only once performed an EKG. She testified that on one occasion Christensen sent a letter stating he was going to terminate her treatment contract because she was being reported to authorities for abusing opioids. She testified she appeared at a scheduled visit anyway and continued to see Christensen for another year with no change in her prescriptions. She also met once with a counselor in his practice for an evaluation but testified that Christensen told her everything seemed good and he would not modify her prescriptions. Eventually, Golden moved to Oregon to quit opioids and began using methamphetamine to cope with withdrawals.

¶55    Hiscoe testified that her follow-up appoints were only five to ten minutes, that Christensen never again performed any physical exams, attempted to treat her underlying condition, discussed goals or plans for treatment, or discussed the risks of using opioids while suffering from depression. She testified that once she asked Christensen as to whether she should be concerned about mixing opioids with benzodiazepines. Christensen told her that it was mostly a concern for patients not used to taking those kinds of medications. She also testified her drug addiction was most severe when she was seeing Christensen and that on multiple occasions, her children found her unconscious and unable to function, but that she did not disclose these events to Christensen.

28

¶56    Lieberg testified that Christensen never discussed any options for alternative treatments. Subsequent visits were only 20 minutes each time, there were no other physical exams other than prolotherapy, and he was never referred to any specialists. Lieberg testified that there was once a discussion about obtaining a chemical dependency evaluation, which he received, but the results were never discussed. He stated that on several occasions he could not fill his prescriptions because the number of pills was too high. Lieberg's mother testified that eventually, Lieberg tried to commit suicide. She responded by reporting Christensen to the DEA.

¶57    Sutherland testified that she once inquired as to her drug tolerance, and Christensen responded only that her tolerance was "pretty high." She was also asked to see a chemical dependency counselor in his office, but the results were never discussed. She stated that she was never provided a recommendation for addiction treatment or counseling. She also stated that only the Corvallis pharmacy would fill her prescriptions. Eventually she quit seeing Christensen when Child Protective Services took away her daughter "because of the state that I was in."

¶58    Jessop testified that she never had any subsequent physical exams and that her prescriptions were simply refilled every two weeks. She testified that there was no other treatment plan other than how many pills per day she was to take and that there was never any discussion as to alternative forms of treatment or addiction counseling. She also stated that only one urinalysis test was conducted and there was never a discussion about the results. She testified that on multiple occasions she told Christensen her medications were lost, stolen, or dropped in the toilet, and that he never documented the instances or modified

29

her prescriptions. She also testified it was evident that she was a drug addict, that she was taking heroin and methamphetamine on the side, and that she lost nearly 40 pounds throughout the course of her treatment from Christensen. She stopped seeing Christensen in 2012 after she was arrested for stealing one of Christensen's prescription pads and was forging his signature to obtain prescription drugs.

¶59 Gore testified that on subsequent visits he was never asked to get a new MRI for his back. He stated that it became difficult to fill his prescriptions because of the quantity of drugs he was receiving. Eventually, to obtain a three-month prescription, Gore testified that he was required to see an addiction counselor and complete a urinalysis test. He used someone else's urine to pass the test. He was also given two different pill counts for Dilaudid and Roxicet.[19] He stated that he was never given another physical exam, urine test, or pill count. He also stated that Christensen occasionally used street slang to refer to the names and prices of the drugs he was administered.

¶60 Marchand testified that over two years, Christensen never conducted additional physical exams other than one instance following a slip and fall accident at another employer. Marchand testified that he would receive prescriptions for three months at a time, and at each appointment, Christensen would only refill his prescriptions. He testified that prescriptions were just ready at the front desk or he would pass them along directly "when he had time to write them out." Marchand testified that eventually he believed he was addicted to opioids and that he could not function safely.

---

[19] Roxicet (Oxycodone and Acetaminophen) is a combination of opioid and non-opioid pain relief medications.

Exper Testimony Regarding Christensen's Treatment Practices

¶61    Dr Ravitz, Dr. Bender, Dr. Furrow, and Dr. Wasan each reviewed some or all the patient medical files and offered testimony as to Christensen's treatment in relation to the standard of care.  Dr. Wasan testified that Christensen's treatment of all nine surviving patients—Cummings, Peterson, Hiscoe, Golden, Sutherland, Lieberg, Jessop, Gore, and Marchand—fell below or far below the accepted standards of practice recognized in the medical community because Christensen always prescribed high dose opioids, often in conjunction with benzodiazepines, on the very first visit; Christensen administered these prescriptions without proper assessments, review of existing medical files, referrals to properly diagnose underlying conditions, consideration of non-opioid treatments, or comprehensive treatment plans; and Christensen routinely failed to monitor patients' use of heavy dose prescriptions through adequate pill counts or blood or urine tests despite the presence of red flags.  Dr. Wasan noted these red flags included Hiscoe's depression, anxiety, and PTSD; Lieberg's history of opioid abuse and Cummings' addiction history disclosures, both of which Dr. Wasan described as the "equivalent of giving someone a loaded gun"; track marks on Jessop's arms from intravenous drug use; patients' misuse of prescriptions and reports of lost or stolen prescriptions; and Gore's back brace and crutch, which he opined suggested exaggerating or faking symptoms.

¶62    Experts also testified that Christensen's treatment of Philbrick and Griffin did not meet the standards of care in the medical community.  Dr. Ravitz testified that Christensen's medical files for Philbrick did not adhere to the standards expected in the medical community and would not achieve a passing grade for a second-year medical

student. Dr. Ravitz further testified there was no documented evidence Christensen performed a full assessment on Philbrick because there was no review of her medical history, evidence of a physical exam, imaging tests, or evidence of a treatment plan. Dr. Ravitz and Dr. Wasan testified that Christensen's increase of Philbrick's Methadone prescription to 90 mg per day over a six-day period fell well below the standard of care because Philbrick had a history of addiction and alcohol abuse and there were no written warnings, specific instructions to discontinue Fentanyl, short-interval follow ups, or efforts to obtain past medical files.

¶63 Dr. Furrow and Dr. Wasan reviewed Christensen's medical file for Gregg Griffin and testified that there was not an acceptable reason to prescribe Griffin high-dose opioids and benzodiazepines at the beginning of treatment when Griffin had successfully used Suboxone therapy for eight years. Both experts testified this prescription was "dangerous," undermined Griffin's addiction treatment, and put him at a severe risk of overdose or addiction. Dr. Furrow testified that Christensen's medical file did not have any documentation or offer any changes to his prescriptions based on Marchand's assessment, which placed Griffin at a "high risk" for abuse. Dr. Furrow further testified there was no documentation regarding advice, suggestions, warnings, or discussions with Griffin concerning his opioid medication, and that Christensen's limited documentation did not conform to the standard of care in the medical community.

*Christensen's Defense*[20]

¶64    Christensen presented expert testimony from Dr. Forrest Tennant, a Los Angeles physician and doctor of public health who operates a clinic for intractable pain patients. Dr. Tennant testified that from 2001 until 2016, known as the "Decade of Pain," federal efforts sought to encourage every physician and family doctor to engage in widespread opioid prescriptions to treat pain. Dr. Tennant testified that during this period, there was no maximum limit of opioids that could be prescribed, that opioids were considered a first line of defense to treat chronic pain, that doctors did not need to provide a diagnosis before prescribing opioids, and dosages were between the physician and patient to determine. Dr. Tennant further testified that until 2015 or 2016, the prevailing medical opinion was that it was okay to prescribe benzodiazepines and opioids together.

¶65    Dr. Tennant also reviewed all eleven of the patient files in the case and opined as to whether Christensen was operating within the course of a professional practice and whether Christensen was prescribing opioids for a legitimate medical purpose. He testified that

---

[20] Prior to Christensen's witnesses testifying, the State notified the court as to issues regarding the scope of Christensen's lay witness testimony in relation to Gayle Christensen, Christensen's wife and a physical therapist and business manager of Christensen's practice, and Francie Paddock, a receptionist and bookkeeper in Christensen's practice from 2010 to 2012. Christensen sought to elicit testimony from Gayle and Paddock regarding how Christensen's practice operated, availability of alternative pain management modalities, and pricing of treatment to suggest Christensen was acting within the course of a professional practice. The State objected to the relevance of this potential line of questioning. The court sustained the objection, stating that anything that these witnesses observed, experienced, or witnessed in regards to the alleged victims or that was applicable to all patients during the period they were treated was permissible and relevant evidence, but opinion evidence as to whether or not Christensen was a "good doctor" and acting in the course of his practice was too broad and impermissible. Christensen's counsel argued that this testimony should be admitted because it concerned an element of an affirmative defense— that Christensen was at all times acting within the course of a professional practice—and stated that this limiting instruction would "substantially gut the defense" and constituted reversible error.

Christensen's medical charts were about "60 to 70 percent there" relative to what was required, but that it did not take him outside the course of a professional practice even though he found them "unsatisfactory." He testified that the Montana standards, which are based on the National Federation of Medical Board[21] standards, are "very vague" and Christensen had great latitude to treat these patients. He also testified that the eleven patient cases were "very complex," that Christensen "did what he thought was right," and that Christensen was operating within the standard of practice at the time. However, Dr. Tennant also testified that Christensen was "way over his head" and "totally unqualified," that his care was "atrocious" and "laughable" based on present standards, and that his "setting and style were never going to allow the kind of care that would be appropriate in the family practice setting."

¶66 Christensen also testified in his defense. Christensen explained that his philosophy for treating chronic pain patients was to "commit[] to them for as long as you are going to be in practice." He testified that he often provided a list of medications to patients to familiarize them with options and prices because many patients could not afford comprehensive treatment. He also testified that he used lists of drugs and listened to patient requests for certain drugs because he "subscribe[d] very much to the idea that if patients have knowledge of what does or doesn't work for them, that's an appropriate starting place." Christensen explained that while patients asking for certain drugs could be

---

[21] The Federation of State Medical Boards ("FSMB") is a national non-profit organization representing 71 state medical and osteopathic boards of the United States and its territories. The FSMB licenses physicians, investigates complaints, disciplines medical practitioners violating the law, conducts evaluations, and facilitates physician rehabilitation.

considered a red flag, he was "more than willing to put aside that issue of whether the patient had a preference by allowing a discussion of what had been used in the past."

¶67 Christensen also testified that when the prescription drug registry[22] became available in Montana, he did not keep records of how many times he utilized the database. He testified that his former P.A., Robin Rice, was "certainly more inclined to want the reassurance that there wasn't doctor shopping, multiple prescribers involved." Christensen also testified that when treating Sutherland, she admitted to him that "she had had a lot of use of street drugs," and "[s]he sought out whatever she could ger her hands on to treat the pain." He testified that this was a "red flag" but that it did not stop him from prescribing opioids to her because "the underpinning idea behind management of chronic pain as a progressive disorder is that if you can adequately control the pain, you can change the outcome." Christensen further testified that his treatment as to Sutherland was based "entirely on that level of communication with the patient." He stated that he was concerned about the amount of opioids and medications he was prescribing to her but did not stop prescribing Methadone because "at every point of making the decision whether I would continue to use what I was using . . . there was a report that she was gaining, incrementally, more and more ability to be on her feet . . . ."

---

[22] The Montana Prescription Drug Registry is an online tool used to provide a list of controlled substance prescriptions to health care providers to improve patient care and safety and identify potential misuse, abuse, and/or diversion of controlled substances. In 2011, the Montana Legislature authorized the use of The Montana Prescription Drug Registry, §§ 37-7-1501 through 1515, MCA. This registry became functional in 2012.

¶68    On cross-examination, Christensen was questioned regarding his treatment of some of his patients that overdosed in Idaho. Christensen stated that, "I was accused of having a role in the death of several patients, most of whom were not under my care when they died." He also stated that after his second Board stipulation in Idaho, "I had 10 years to reevaluate my prescription writing practices." The State asked Christensen whether he had the opportunity to reevaluate his prescription writing practices following the death of Griffin. Christensen responded, "The outcome of any patient I treat needs to be taken into account in terms of how I continue to treat other patients in a similar manner." Finally, Christensen admitted that he previously told the Task Force during the beginning of the investigation in this case that "85 percent" of the pharmacies in the area would not fill his prescriptions.

*State's Rebuttal*

¶69    The State provided testimony from Mary Leonard, an investigator and subsequently an associate director for the Idaho Board of Medicine. Leonard was assigned Christensen's case in 1999. Leonard testified that it was "not true" that most of the patients whom Christensen treated in Idaho who died from overdoses were not under his care at that time. Leonard testified that she received the information from these deaths, reviewed patient medical records, pharmacy printouts, information from law enforcement, and coroners' reports that showed Christensen's names on pill bottles found within residences or place of death of these patients.[23] Of the five overdose deaths of which Christensen was notified

---

[23] At trial, Christensen's counsel objected to this testimony as inadmissible hearsay.

of in the disciplinary proceeding, Leonard testified that all five were under his medical care and records reflect he prescribed all of them controlled substances. Leonard also testified that all five of these patients were on a combination of opioids and benzodiazepines and died from an overdose of those prescriptions.

¶70 Following Leonard's testimony, Christensen's counsel requested that the court have a M. R. Evid. 404(b) instruction read as part of the final instructions. The State did not object and the court included Instruction No. 28, Evidence of Other Acts, which addressed the limited purpose for which the jury could use Christensen's past conduct in Idaho.

*Closing Arguments*

¶71 During closing argument, the State referenced the Montana standards of practice, stating that physicians do not meet these standards by "handing them opioids the first time and saying there, I treated you." The State also explained that in determining whether Christensen could be convicted for criminal distribution, "It's not about a physical building. It's about are you conducting yourself as a part of the professional practice." The State also opined that Christensen "is not just like all the [practitioners in Montana], because all the others were practicing medicine[.]" The State offered that "The only [patients] who went to [Christensen] because others wouldn't—or they didn't want to keep going to the others, are the addicts, because the people doing it right made it too tough."

¶72 The State further explained that the Idaho Board investigations were relevant because "It's the notice [Christensen] was put on. It's what he learned and did not change[,]" and "He was put on notice, if you do this people die. He did nothing to change. He did it again. People died. It's that simple." The State told the jury, "What I'm asking

37

you is to say to Dr. Christensen you cannot do that in Idaho, put your blinders on, come over here in Montana, ignore everything you should have learned and do the same thing here. Tell him that is criminal. It fits every definition. That is criminal."

*Jury Instructions*

¶73    Prior to administering jury instructions, Christensen's counsel objected to the language in the State's instruction as to criminal distribution, arguing that there was nothing in the instruction about a nationwide standard of care, that the professional practice exemption in § 45-9-101(6), MCA, must be read strictly such that Christensen may not be prosecuted under the statute, and the State must at least follow *Feingold* if the case is to be "legally viable" because Montana law does not prohibit Christensen's conduct.

¶74    The final jury instructions included Instruction No. 23, Criminal Distribution of Dangerous Drugs, which stated:

> [T]o convict a Defendant of criminal distribution of dangerous drugs, for each separate count the State must prove the following elements: (1) that the Defendant prescribed a dangerous drug to another; and (2) that the Defendant acted purposely or knowingly; and (3) the professional practice exemption does not apply to the Defendant's conduct. If you find from your consideration of the evidence that each of these elements have been proved beyond a reasonable doubt, then you should find the Defendant guilty.

¶75    Jury Instruction No. 24 articulated the professional practice exemption:

> A practitioner who prescribes a dangerous drug to a patient is distributing that dangerous drug. However, a practitioner is exempt from prosecution and may not be convicted of criminal distribution of dangerous drugs if he delivers that prescription while acting in the course of a professional practice.
>
> The exemption does not apply if a practitioner purposely or knowingly prescribes a dangerous drug for no legitimate medical purpose while acting outside of the regular course of a professional practice.

38

You are not required to determine if any patient receiving a prescription had a legitimate medical condition. Rather, you must determine whether the Defendant had a legitimate medical purpose within the regular course of a professional practice when he delivered the particular prescription being considered.

The legitimacy of the "medical purpose" is not determined merely by a practitioner's sincere intent towards his patient. Instead, you are to determine from the evidence whether the Defendant made an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice, if any, that was generally recognized and accepted in the State of Montana during the time period in which the prescription occurred.

Evidence in this case offered regarding the applicable standard of medical practice was not offered to establish malpractice, but rather to support the State's claim that there was an absence of any legitimate medical purpose. It is up to you as jurors to decide if the State has proven beyond a reasonable doubt the absence of any legitimate medical purpose.

While a practitioner may not be convicted of criminal distribution of dangerous drugs based on mere negligence, practitioners who act outside the regular course of professional practice by purposely or knowingly prescribing dangerous drugs for no legitimate medical purpose are not entitled to this exemption, and may be prosecuted for and convicted of criminal distribution of dangerous drugs in accord with all the instructions given to you.

¶76 Jury Instruction No. 28, "Evidence of Other Acts," was also offered to instruct the jury as to the proper use of Christensen's past conduct in Idaho introduced at trial. This instruction stated:

The State has offered evidence that the Defendant at another time engaged in wrongs or acts. That evidence was not admitted to prove the character of the Defendant or to show he acted in conformity therewith. The only purpose of admitting that evidence was to show knowledge, mental state, and/or absence of mistake or accident. You may not use that evidence for any other purpose.

¶77 The jury returned a verdict finding Christensen guilty of all eleven counts of Criminal Distribution of Dangerous Drugs.

**Discussion**

Constitutional Claims

¶78 We first address the host of constitutional issues Christensen raises on appeal. Christensen argues that by admitting evidence of the underlying conduct of treatment of Idaho patients at trial, the court violated his constitutional protections against double jeopardy and confrontation clause rights. Absent plain error, allegations that constitutional rights have been violated cannot be raised for the first time on appeal. *State v. Minez*, 2004 MT 115, ¶ 30, 321 Mont. 148, 89 P.3d 966. Moreover, acquiescence in the alleged error negates the right of objecting to it. *State v. Brown*, 1999 MT 339, ¶ 19, 297 Mont. 427, 993 P.2d 672. Christensen did not object before trial or at trial to Uranga's or Leonard's testimony on constitutional grounds regarding the "thumbnail" sketches of allegations against Christensen in the Idaho Board cases, but only sought to exclude such testimony as irrelevant or as inadmissible hearsay. Having abandoned his constitutional objections at trial, Christensen is precluded from raising these issues on appeal.

¶79 Christensen further raises a prosecutorial misconduct claim for the first time on appeal, arguing that the State misled the jury by suggesting in closing argument that Christensen was the definitive cause of drug overdose deaths in Idaho. Criminal defendants are entitled to a constitutional right to a fair trial by jury. *State v. Lawrence*, 2016 MT 346, ¶ 13, 386 Mont. 86, 385 P.3d 968 (internal quotations and citations omitted); U.S. Const. amend. VI; Mont. Const. art. II, § 24. We do not presume prejudice from the alleged misconduct; rather, the defendant must demonstrate that the alleged misconduct violated his substantial rights. *Lawrence*, ¶ 13. Moreover, this Court does not isolate the

challenged comments upon review but considers the challenged comments in the context of the trial and the closing argument as a whole. *Lawrence*, ¶ 13.

¶80     Christensen refers to the State's comments in closing argument in isolation, ignoring the greater context in which these comments were presented. Evidence of Christensen's past conduct in Idaho was specifically used to demonstrate that Christensen was on "notice," i.e., that because he was stripped of his medical and DEA licenses in Idaho following overdose deaths of patients, he was thus aware that his prescribing practices were outside the course of a professional practice and that prescribing opioids in large quantities without adequate tests, referrals, and follow-ups could risk bodily harm or death.

¶81     The State appropriately referenced the purpose of this evidence in opening statements—explaining that Christensen did not admit liability, and in closing argument—stating that when "the Defendant moved his practice to Florence Montana . . . he *knew* the dangerous risks to his patients' lives and health to overprescribing opiates[,]" and "He was *put on notice* that if you do this, your patients die." (Emphasis added.) The court, upon Christensen's request, further instructed the jury as to the limited purpose of this evidence, providing Instruction No. 28, which explained that "The Defendant is not being tried for those other wrongs or acts[,]" and "The only purpose of admitting that evidence was to show knowledge, mental state, and/or absence of mistake or accident." Considering the trial as a whole, we find the State did not commit prosecutorial misconduct such that it deprived Christensen of a fair trial.

¶82     Christensen also argues that the District Court denied him of his constitutional right to present a complete defense because (1) it excluded the testimony of 28 of his former

41

patient witnesses when it granted the State's motion in limine, (2) barred testimony at trial from Gayle Christensen and Francie Paddock who would have testified as to Christensen's general day-to-day practice, and (3) restricted Christensen's cross-examination of Erica Cummings.

¶83   A defendant in a criminal trial has a constitutional right to a meaningful opportunity to present a complete defense. *State v. Glick*, 2009 MT 44, ¶ 29, 349 Mont. 277, 203 P.3d 796. However, this right is not absolute; state rules excluding evidence from criminal trials do not abridge a defendant's right to present a defense so long as the rule is not arbitrary or disproportionate to the purpose it is designed to serve. *State v. Hauer*, 2012 MT 120, ¶ 24, 365 Mont. 184, 279 P.3d 149; *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998). A district court has broad discretion when determining the relevance and admissibility of evidence. *State v. Daniels*, 2011 MT 278, ¶ 11, 362 Mont. 426, 265 P.3d 623. Evidence which is not relevant is not admissible. M. R. Evid. 402.

¶84   Christensen argues that the testimony of his 28 former patients was relevant to his affirmative defense that he was prescribing drugs in the course of a professional practice, and that this evidence was admissible pursuant to M. R. Evid. 406, Habit or Routine Practice. Christensen asserts these patients would have provided a corrective impression of his professional practice as a whole, including an absence of a criminal scheme to distribute controlled substances without a legitimate medical purpose.

¶85   M. R. Evid. 406(b) provides, "Evidence of habit or of routine practice . . . is relevant to prove that conduct on a particular occasion was in conformity with the habit or routine practice." This case is not a civil medical malpractice case, however, but a criminal trial,

42

the charges which allege that Christensen was *not* acting in the course of his professional practice when he was treating the eleven patients in question. Whether the proposed testimony of former patients is admissible therefore rests on whether this testimony was *relevant* to his treatment of the eleven identified patients.

¶86 Christensen conceded that none of these former patients were present when he treated or prescribed dangerous drugs to the eleven charged patients. Thus, Christensen was not seeking to use former patient testimony to prove that his conduct when treating and prescribing to the eleven patients in this case conformed with his routine practice, but only that his treatment of these patients was an error and therefore he did not possess the criminal intent necessary to be prosecuted. Accordingly, their testimony was irrelevant as to whether Christensen acted in the course of a professional practice when treating the patients here. The District Court did not err in granting the State's motion in limine to exclude this former patient testimony.

¶87 Likewise, the District Court did not err in excluding testimony from Gayle Christensen and Francie Paddock as to Christensen's general day-to-day practice. Whether Christensen "generally" operated in the course of a professional practice is not relevant to the determination as to whether Christensen operated in the course of a professional practice as to the eleven charged patients. Because Gayle and Paddock were not testifying as to Christensen's treatments with regards to these patients, their offered testimony was irrelevant, and therefore, inadmissible. M. R. Evid. 401, 402.

¶88 Christensen further asserts that his Confrontation Clause rights were violated because he was not allowed to question Cummings on cross-examination as to the benefits

she received under the plea bargain in her own criminal trial, in which the State agreed to drop her negligent homicide charges in exchange for her testifying against Christensen in the present case.

¶89    The Sixth Amendment's Confrontation Clause, applicable to state prosecution via the Fourteenth Amendment to the United States Constitution, guarantees a criminal defendant the right "to be confronted with the witness against him."  U.S. Const. Amends. VI, XIV; *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1254, 1259 (2004).  The main purpose of confrontation is to secure for the opponent the opportunity to cross-examine and expose a witness's motivation in testifying.  *State v. Nelson*, 2002 MT 122, ¶ 14, 310 Mont. 71, 48 P.3d 739.  However, a trial court retains broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial.  *State v. Beavers*, 1999 MT 260, ¶ 36, 296 Mont. 340, 987 P.2d 371.  Limiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness; the Confrontation Clause guarantees an "opportunity" for effective cross-examination, not cross-examination that is effective in whatever way or to whatever extent the defendant desires.  *Nelson*, ¶ 19.

¶90    At trial, Christensen did not object to violations of his due process and confrontation rights, but only objected as to state law evidentiary issue.  And Christensen agreed to a stipulation pretrial that inferences of potential sentences Christensen faced for charges in the present case could not be presented to the jury.  Christensen acquiesced to any error by the trial court in limiting the cross-examination of Cummings.  Christensen's constitutional

due process and confrontation rights are thus unpreserved and may not be challenged on appeal. *See State v. Reim*, 2014 MT 108, ¶¶ 28-29, 374 Mont. 487, 323 P.3d 880.

¶91 Moreover, Christensen was provided an ample opportunity to cross-examine Cummings and explore the benefit she received under the plea agreement. Cummings already pleaded guilty to her crimes and had already been sentenced at the time she testified. Whatever sentence she could have received for other charges was irrelevant. The District Court did not err in restricting Christensen's cross-examination of Cummings.

¶92 Lastly, Christensen argues that the plain language of Montana's criminal distribution statute, § 45-9-101, MCA, prohibits Christensen from being prosecuted under Montana law, and broadening its meaning violates his constitutional due process rights. Christensen argues that he cannot be prosecuted for criminal distribution of dangerous drugs under Montana law because (1) § 45-9-101, MCA, does not prohibit "prescribing" of dangerous drugs because "prescribing" does not fit within the plain meaning of "selling, bartering, exchanging, or giving away," and (2), the professional practice exemption in subsection (6) of the statute prevents Christensen from being prosecuted under Montana law.

¶93 Section 45-9-101(1), MCA, provides in part, "a person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug, as defined in 50-32-101." Dangerous drugs include "a drug, substance, or immediate precursor in Schedules I through V . . . ." Section 50-32-101(6), MCA. Section 45-9-101(6), MCA, provides that "Practitioners, as defined in 50-32-101, and agents under their supervision

45

acting in the course of a professional practice are exempt from this section." A practitioner includes a "physician . . . or other person licensed, registered, or otherwise permitted to distribute, dispense . . . or to administer a dangerous drug in the course of professional practice or research in this state[.]" Section 50-32-101(24)(a), MCA.

¶94 It is undisputed that Christensen was prescribing dangerous drugs, including Schedule II opioids and Schedule IV benzodiazepines, to patients. It is further undisputed that at the time the alleged offenses occurred, Christensen wrote all prescriptions at his office, employed professional staff, and maintained a Montana medical license and DEA license. Whether Christensen may be prosecuted and convicted under the statute therefore rests on whether (1) "prescribing" dangerous drugs constitutes "selling, bartering, exchanging, or giving away," and (2) he was operating outside the course of a professional practice at the time he prescribed these controlled substances.

¶95 "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." *City of Missoula v. Fox*, 2019 MT 250, ¶ 18, 397 Mont. 388, 450 P.3d 898. When interpreting a statute, this Court's objective is to implement the objectives the Legislature sought to achieve. *Bullock v. Fox*, 2019 MT 50, ¶ 52, 395 Mont. 35, 435 P.3d 1187. The starting point for interpreting a statute is the language of the statute itself. *Bullock*, ¶ 52. If the intent of the Legislature can be determined from the plain meaning of the words used in the statute, the plain meaning controls. *Mont. Vending, Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499. Where the Legislature has not defined a statutory term, we consider the term

46

to have its plain and ordinary meaning, and may consider dictionary definitions, prior case law, and the larger statutory scheme in which the term appears. *State v. Alpine Aviation, Inc.*, 2016 MT 283, ¶ 11, 385 Mont. 282, 384 P.3d 1035; *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666. This Court will give effect to all provisions of the statute if possible. *Bullock*, ¶ 53.

¶96 The Montana Legislature has not provided a definition as to "selling, bartering, exchanging, or giving away." Accordingly, we consider these terms to have their plain and ordinary meaning. Black's Law Dictionary defines "exchange" as "The act of transferring interests, each in consideration for the other." *Exchange*, *Black's Law Dictionary* (11th ed. 2019). We find that "prescribing" of dangerous drugs fits squarely within the definition of exchange. In exchange for payment, Christensen routinely prescribed dangerous drugs to the eleven named patients in this case.[24] Accordingly, § 45-9-101(1), MCA, does not prohibit Christensen from being prosecuted for prescribing dangerous drugs so long as he is acting outside the course of his professional practice.

¶97 Further, § 45-9-101(6), MCA, does not offer a blanket exemption for physicians from prosecution under the statute, but only does so in the instance in which a physician is "acting in the course of a professional practice." Logically, a physician *not* acting within the course of a professional practice may be prosecuted under Montana's statute. Naturally, if the Montana Legislature had intended physicians to be exempt from the

---

[24] While Christensen also relies on other state court interpretations of similar statutes in support of his argument, none of these statutes possess identical language to Montana's criminal distribution statute. Nor do out-of-state decisions possess any binding authority on this Court or provide insight as to the intent of Montana's Legislature when crafting statutory language.

statute, it would have provided a wholesale exception rather than create subsection (6). If this Court were to adopt Christensen's narrow reading of the statute, it would render subsection (6) meaningless. *See State v. Heath*, 2004 MT 126, ¶ 31, 321 Mont. 280, 90 P.3d 426 ("We are required to avoid any statutory interpretation that renders any sections of the statute superfluous and does not give effect to all the words used." (citation omitted)).

¶98 Here, the State did not attempt to argue that Christensen could be prosecuted despite acting in the course of a professional practice or challenge Christensen's assertion that he maintained an office or employed professional staff when issuing prescriptions. Rather, the State alleged that Christensen was acting outside the course of a professional practice with regard to the eleven named patients because he eschewed the use of appropriate documentation, assessments, tests, follow-ups, referrals, and provided dangerous drugs in obscene quantities such that Christensen was not acting like a physician at all but instead was acting as a "drug pusher." Accordingly, under the plain meaning of § 45-9-101, MCA, Christensen may be prosecuted for criminal distribution of dangerous drugs.

¶99 Relatedly, Christensen argues that the State inappropriately relied on a federal distribution statute, 21 U.S.C. § 841(a), and federal case law in support of its interpretation of § 45-9-101, MCA, when charging Christensen, arguing that the federal statute and case law is substantially different than Montana's criminal distribution statute. We disagree.

¶100 The Federal Uniform Controlled Substances Act ("CSA") provides, "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a). Federal courts have routinely held that physicians and

48

practitioners remain subject to criminal prosecution under § 841 when their activities fall "outside the usual course of a professional practice." *United States v. Moore*, 423 U.S. 122, 124, 96 S. Ct. 335, 337 (1975); *United States v. Larson*, 507 F.2d 385, 388 (9th Cir. 1974); *United States v. Mackay*, 715 F.3d 807, 824-25 (10th Cir. 2013).

¶101   Indeed, in enacting Montana's drug legislation, the Montana Legislature has long relied on the CSA for guidance. *See State ex rel. Lance v. Dist. Court*, 168 Mont. 297, 299-300, 542 P.2d 1211, 1212-13 (1975); *State v. Pirello*, 2012 MT 155, ¶¶ 14-18, 365 Mont. 399, 282 P.3d 662.  Like the CSA and federal case law, § 45-9-101(6), MCA, does not generally exempt physicians merely because they have maintained a license to prescribe prescription drugs or conduct their practice in a legitimate office environment but only exempts those who are acting "in the course of a professional practice." *See Moore*, 423 U.S. at 138, 143, 96 S. Ct. at 343, 345.  Thus, the principal inquiry as to whether a physician is liable for criminal distribution of dangerous drugs is not whether he or she maintains an office or professional staff, but whether the physician ceases to distribute or dispense controlled substances as a medical professional and instead acts as a "pusher." *Feingold*, 454 F.3d at 1008.

¶102   Because this case is novel in Montana and federal law defining whether a physician is acting within the course of a professional practice is congruent with Montana's criminal distribution statute, it was appropriate for the State and the District Court to consult the CSA and *Moore* and its progeny in interpreting § 45-9-101, MCA.

Procedural Claims

¶103 Christensen argues that the District Court improperly instructed the jury as to the offense of criminal distribution because unlike the primary federal case,[25] *Feingold*, on which the District Court relied in crafting its jury instructions, the instructions (1) did not instruct the jury on the heightened mens rea requirement of "intent" necessary for a physician to be criminally liable for drug distribution, but only required the State to prove Christensen acted "purposely or knowingly," and (2) did not include a "good faith" defense component.[26]

¶104 In *Feingold*, the defendant, Dr. Jeffrey Feingold, a naturopathic physician licensed in Arizona, was indicted for 185 counts of illegal distribution of controlled substances in violation of 21 U.S.C. § 841(a) for disregarding proper prescribing practices, failure to

---

[25] Alternatively, Christensen argues that the District Court erred as a matter of law by using jury instructions based on federal case law to instruct the jury on Montana law. Although Christensen now challenges the use of *Feingold*, the State's first pretrial motion before the District Court sought an order clarifying Montana's drug distribution statute and adoption of jury instructions, relying on *Feingold* in support of its motion. Christensen did not file a brief in opposition, and the District Court determined that Christensen's failure to file a brief operated as an admission that the State's motion was well taken. Accordingly, Christensen effectively waived his right to raise this issue on appeal. *State v. Hanna*, 2014 MT 346, ¶ 22, 377 Mont. 418, 341 P.3d 629; § 46-16-410(3), MCA. Further, Montana supports adopting principles of federal jury instruction law to clarify important safeguards in the absence of applicable Montana case law. *State v. Grimes*, 1999 MT 145, ¶¶ 43, 45, 295 Mont. 22, 982 P.2d 1037; *Nelson*, ¶ 23. As explained above, because this case is novel in Montana, and *Feingold* and other federal case law as to whether a physician may be prosecuted for criminal distribution is not incongruent with Montana's Criminal Distribution statute, the District Court did not err in relying on *Feingold* in crafting its jury instructions as to Criminal Distribution.

[26] Christensen further asserts that the final jury instructions did not instruct the jury on the difference between civil and criminal liability. However, the good-faith instruction provided clarifies "a practitioner may not be convicted of criminal distribution of dangerous drugs based on mere negligence," but only may be for "purposely or knowingly prescribing dangerous drugs for no legitimate medical purpose." This instruction clearly indicates that standard negligence, the standard required for a medical malpractice civil lawsuit, does not apply.

50

provide physical examinations, improper recordkeeping for prescriptions, and writing prescriptions to recovering drug addicts. *Feingold*, 454 F.3d at 1004-06. The District Court instructed the jury that it had to find three elements to convict Feingold under § 841(a) as a licensed practitioner: (1) the defendant distributed a controlled substance; (2) the defendant distributed the controlled substance knowingly and intentionally; and (3) the defendant prescribed or distributed the substance other than for a legitimate medical purpose and not in the usual course of professional practice." *Feingold*, 454 F.3d at 1006. The District Court also provided a supplemental instruction regarding the good faith defense:

> A practitioner may not be convicted of unlawful distribution of controlled substances when he distributes controlled substances in good faith to patients in the regular course of professional practice. Only the lawful acts of a practitioner, however, are exempted from prosecution under the law. A controlled substance is distributed by a practitioner in the usual course of his professional practice if the substance is distributed by him in *good faith* in medically treating a patient. Good faith is not merely a practitioner's sincere intention towards the people who come to see him, but, rather, it involves his *sincerity* in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country. Thus, *good faith* in this context means an *honest effort* to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country. However, practitioners who act outside the usual course of professional practice and prescribe or distribute controlled substances for no legitimate medical purpose may be guilty of unlawful distribution of controlled substances.

*Feingold*, 454 F.3d at 1006 (emphasis added).

¶105 The jury found Feingold guilty on all 185 counts. *Feingold*, 454 F.3d. at 1006. Feingold appealed, arguing that the district court misrepresented the elements of the crime because the jury instructions permitted the jury to convict him without an adequate

51

determination of his mens rea, and that to convict a licensed practitioner under the federal statute, a jury must look into his subjective state of mind and determine that he intended to act outside the course of his professional practice. *Feingold*, 454 F.3d. at 1007. The court agreed, explaining that "a practitioner who acts outside the usual course of professional practice may be convicted under § 841(a) only if he does so intentionally." *Feingold*, 454 F.3d. at 1007. The Ninth Circuit emphasized that to convict a practitioner under § 841(a), the jury must make a finding of intent both with respect to distribution and with respect to the doctor's intent to act as a pusher rather than a medical professional. *Feingold*, 454 F.3d at 1008.

¶106 The court, however, was satisfied that the jury instructions required the jury to find that Feingold intentionally acted outside the usual course of professional practice despite the instructions not explicitly using the word "intent," because the supplemental instructions made at least four references to Feingold's state of mind, all in connection with instructions regarding the professional competence of a licensed practitioner. *Feingold*, 454 F.3d at 1008. Viewed in their entirety, the court held that the instructions "compelled the jury to consider whether Dr. Feingold intended to distribute the controlled substances for a legitimate medical purpose and whether he intended to act within the usual course of professional practice." *Feingold*, 454 F.3d at 1009.

¶107 Christensen's argument conflates the federal heightened mens rea requirement— "intent"—with Montana's "purposely" or "knowingly" requirement. Beginning in 1973, the Montana Legislature modified the mens rea culpability requirements, adopting "purposely" and "knowingly" to embody "intent." *See State v. Sharbono*, 175 Mont. 373,

52

393, 563 P.2d 61, 72 (1977). Section 45-2-103(1), MCA, provides, "Except for deliberate homicide . . . or an offense that involves absolute liability, a person is not guilty of an offense unless, with respect to each element described by the statute defining the offense, a person acts while having one of the mental states of knowingly, negligently, or purposely." In Montana, in order to be found guilty of criminal distribution of dangerous drugs, direct or circumstantial evidence must establish that the defendant acted "purposely" or "knowingly" with regards to each element of the crime. *See* § 45-9-101, MCA; *State v. Otto*, 2014 MT 20, ¶ 5, 373 Mont. 385, 317 P.3d 810.

¶108 Here, the State and the District Court relied on *Feingold* not for its federal mens rea requirement but to ensure that important safeguards were followed in the unique instance where a physician is being prosecuted for criminal distribution. By consulting *Feingold*, the court ensured that the State's burden was not only to prove criminal intent with respect to Christensen's distribution of dangerous drugs, but also Christensen's intent to do so outside the course of a professional practice. The jury instructions here meet the requirement for Montana law, repeating that the professional practice exemption does not apply if the defendant "purposely or knowingly prescribes a dangerous drug for no legitimate medical purpose." It is clear, based on this instruction, that the jury must infer that to convict Christensen for criminal distribution he must have known that he was distributing a dangerous drug and was doing so for no legitimate medical purpose.

¶109 Further, the "good faith" instruction was also provided. The supplemental instruction provides:

53

> The legitimacy of the "medical purpose" [exemption] *is not determined merely* by a practitioner's sincere intent towards his patient. Instead, you are to determine from the evidence whether the Defendant made an *honest effort* to prescribe for a patient's condition in accordance with the standard of medical practice, if any, that was generally recognized and accepted in the State of Montana during the time period in which the prescription occurred.

(Emphasis added.) This instruction fundamentally mirrors the additional instruction in *Feingold*, which provided, "Good faith is not merely a practitioner's sincere intention towards the people who come to see him, but, rather, it involves his *sincerity* in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country." *Feingold*, 451 F.3d at 1006. Here, the State had to prove that Christensen acted purposely or knowingly when distributing dangerous drugs and without a legitimate medical purpose. The District Court did not err in its instruction to the jury for criminal distribution of dangerous drugs.

¶110 Christensen also raises several arguments that the District Court erred in allowing impermissible 404(b) evidence to be admitted at trial. First, Christensen argues that the District Court's admission of testimony from Idaho Board witnesses Uranga and Leonard, who provided "thumbnail sketches" of overdose victims Christensen treated in Idaho, violated the court's order on motions in limine, was barred as irrelevant under M. R. Evid. 404(b), and was prejudicial under M. R. Evid. 403 and *State v. Buckles*, 2018 MT 150, 391 Mont. 511, 420 P.3d 511. Christensen further argues that the State did not provide him with sufficient notice as to the use of this evidence before trial and that the District Court failed to conduct a hearing prior to admitting this evidence.

¶111   M. R. Evid. 404(b) prohibits evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." *State v. Spottedbear*, 2016 MT 243, ¶ 44, 385 Mont. 68, 380 P.3d 810.  However, prior act evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  M. R. Evid. 404(b).  The distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance. *State v. Blaz*, 2017 MT 164, ¶ 12, 388 Mont. 105, 398 P.3d 247.  Moreover, Rule 404(b) must be viewed in concert with M. R. Evid. 403, which allows the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.  *State v. Franks*, 2014 MT 273, ¶ 15, 376 Mont. 431, 335 P.3d 725.  This occurs "when the evidence will prompt the jury to decide the case on an improper basis." *State v. Stewart*, 2012 MT 317, ¶ 67, 367 Mont. 503, 291 P.3d 1187.

¶112   Prior to admitting 404(b) evidence, the prosecution must disclose evidence it intends to use regarding "other crimes, wrongs, or acts"; it is the defendant's burden to identify any of the State's evidence he or she believes should be excluded as irrelevant or unfairly prejudicial and provide argument and authority as to why such evidence should be excluded. *State v. Dist. Court of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 49, 358 Mont. 325, 246 P.3d 415.  The court also "s*hould* conduct a hearing and issue a written decision with appropriate findings of fact and conclusions of law." *Eighteenth Jud. Dist.*, ¶ 49 (emphasis added).

¶113 Evidence of Christensen's prior Idaho conduct was highly relevant and admissible for non-propensity purposes for all three of Christensen's charges—to demonstrate that Christensen's prescribing practices were done purposely or knowingly and not the product of a mistake or accident, that he knew of the harm of death or bodily injury by prescribing opioids without carefully following important safeguards, and that he should have been aware of the risk of death by prescribing opioids and benzodiazepines to patients who exhibited histories of drug abuse. And precisely because this evidence was highly probative it was therefore not unduly prejudicial.[27] *See Blaz*, ¶ 20 (probative evidence rises to the level of being unfairly prejudicial only "if it arouses the jury's hostility or sympathy for one side *without regard to its probative value . . . .*") (emphasis added). Probative evidence is frequently prejudicial to the defendant; this does not make such evidence unfairly prejudicial, requiring exclusion. *State v. Buslayev*, 2013 MT 88, ¶ 11, 369 Mont. 428, 299 P.3d 324.

---

[27] Christensen also argues that the court allowed unfairly prejudicial transaction evidence in admitting testimony from Detective Basnaw regarding his assertion that Christensen was responsible for a large number of overdose deaths, the State's questioning of Christensen that "85 percent" of pharmacies refused to fill his prescriptions, as well as testimony from Cummings, Golden, Jessop, and Gore, all who testified that they heard about Christensen because he was an easy source of prescription pills. For the same reasons as Christensen's past Idaho conduct, this evidence was highly probative and admissible for non-propensity purposes—to show knowledge and absence of mistake—for all Christensen's charges. Moreover, the State did not elicit the challenged testimony of Basnaw; rather, Basnaw made this statement on cross-examination when he was asked "when did you decide to target my client." Similarly, the State questioned Christensen as to the truthfulness of his own prior admission when he purportedly told the Task Force that "85 percent of pharmacies" refused to fill his prescriptions. Further, Christensen did not object to testimony from Cummings, Golden, Jessop, and Gore and therefore waived his right to challenge the admissibility of this testimony on appeal. *Longfellow*, ¶ 19.

¶114   Christensen was provided with sufficient notice about the proposed use of the Idaho evidence. The State's Information, filed over two years prior to trial, clarified that it would seek to rely on evidence from Idaho to show Christensen was operating outside the course of a professional practice. Through his pretrial discovery demands, Christensen received notes from law enforcement officials to be used at trial, was supplied with thousands of pages of discovery materials, and was notified by the State's motion in limine about law enforcement's contextual evidence it planned to introduce at trial. And at trial, prior to Uranga's testimony, Christensen's counsel acknowledged that "I'm not suggesting in any way that the information [of the Idaho allegations] itself is a surprise or that the state failed to provide it to us or anything like that." Accordingly, Christensen waived any objection on appeal and cannot now claim unfair surprise to the State's proposed testimony stemming from his Idaho Board cases.

¶115   The District Court also did not evade its gatekeeping duties in permitting at trial the evidence of Christensen's prior conduct in Idaho. Christensen's motion in limine did not request a hearing on the proposed admissibility of the evidence, nor did he file a reply brief asking for a hearing. Nonetheless, the District Court clearly grasped the significance of this proposed evidence, issuing an order explaining that evidence of Christensen's Idaho conduct was permissible for non-propensity purposes. Moreover, the court consulted with both parties prior to Uranga's testimony, to which Christensen's counsel acknowledged that "they've got to get into the allegations some, so I'm not necessarily suggesting that the testimony should be restricted . . . ." The court limited the State's questioning of Uranga to the type of drugs involved in Idaho, the number of complaints, and general Idaho Board

57

allegations, and the State did not reference Christensen's federal charges, trial, or acquittal stemming from his Idaho conduct. And at Christensen's behest, the court included Instruction No. 28, which specified the proper purpose for which this evidence could be used, further mitigating any risk of unfair prejudice. The District Court did not err in admitting testimony as to Christensen's prior Idaho conduct.

Sufficient Evidence Claim

¶116 Finally, Christensen argues that there was insufficient evidence for the jury to conclude that Christensen committed criminal distribution of dangerous drugs. Christensen argues that the State failed to demonstrate that he was acting outside the course of a professional practice because every patient had a legitimate medical condition that caused him or her pain, no State expert testified that Christensen's treatment was without a legitimate medical purpose or that he prescribed dangerous drugs outside the course of a professional practice, and most of the patients testified that they lied to Christensen about their addictions.

¶117 Here, the jury was tasked with determining whether Christensen committed criminal distribution beyond a reasonable doubt for each of the eleven named patients. Therefore, the jury had to decide, based on the presence of direct and circumstantial evidence, whether Christensen prescribed dangerous drugs to each of these patients purposely or knowingly, and did so without any legitimate medical purpose while acting outside the course of a professional practice. Section 45-9-101(6), MCA; *Feingold*, 454 F.3d at 1008. A person acts knowingly if he "is aware of [his] own conduct or that the circumstance exists." Section 45-2-101(35), MCA. A person acts purposely "if it is the person's conscious object

58

to engage in that conduct or to cause that result." Section 45-2-101(65), MCA. In other words, whether Christensen may be convicted of criminal distribution is contingent on whether he knew what he was doing and/or he did it on purpose.

¶118 A fundamental principle of the criminal justice system is that the State must prove each element of a crime beyond a reasonable doubt. *State v. Laird*, 2019 MT 198, ¶ 59, 397 Mont. 29, 447 P.3d 416. A jury may consider all direct and circumstantial evidence, as well as any legitimate inferences that may be legally drawn therefrom, to determine a defendant's culpability. *Laird*, ¶ 60. The existence of alternative interpretations of circumstantial evidence does not mean that both interpretations are equally persuasive. *State v. Sanchez*, 2017 MT 192, ¶ 17, 388 Mont. 262, 399 P.3d 886. The jury, exclusively, draws inferences from circumstantial evidence and should determine its conclusions on elements of the crime if "warranted by the evidence as a whole." *State v. Kelly*, 2005 MT 200, ¶ 21, 328 Mont. 187, 119 P.3d 67. There is sufficient evidence to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Daniels*, 2019 MT 214, ¶ 27, 397 Mont. 204, 448 P.3d 511.

¶119 At trial, the State presented testimony from Idaho Board witnesses regarding the investigation of Christensen in Idaho in an effort to demonstrate that here, Christensen purposely or knowingly prescribed dangerous drugs outside the course of a professional practice. Testimony from Uranga revealed that Christensen was previously investigated for prescribing excessive and inordinate amounts of controlled substances, that he prescribed these drugs to addicted persons, and that he was operating outside the accepted

59

standards of medical practice established by the Idaho medical community. Furthermore, Uranga testified that Christensen's second investigation stemmed from violations of his first stipulation with the State of Idaho following overprescribing to 28 former patients, 23 of whom were prescribed opioids in conjunction with benzodiazepines, five of whom died from drug overdoses, and another six who were hospitalized from overdoses. This testimony supported the jury's inference that Christensen acted purposely or knowingly when he engaged in similar conduct in Montana.

¶120   The State also presented extensive expert and patient testimony demonstrating that Christensen failed to adhere to authorized prescribing practices when treating these patients. For all eleven patients, Christensen either failed to conduct adequate initial examinations and assessments or completely disregarded initial assessments. Patients and experts testified that Christensen never contacted past medical providers before offering prescriptions; did not conduct sufficient diagnostic tests; met with patients for only five to 25 minutes on the very first visit; did not use imaging studies to pinpoint the source of patients' pain or understand potential risks with prescribing opioids; never utilized blood or urine tests on the first visit to identify red flags; rarely conducted follow-up appointments other than to refill prescriptions; never used referrals to other medical professionals; never discussed the goals of treatment; and never used an opioid agreement to hold patients accountable. Christensen also ubiquitously refused to utilize other treatment modalities, only using prolotherapy on two occasions for one patient and physical therapy for another.

¶121 Patient and expert testimony reflected that Christensen prescribed opioids on the very first visit to all eleven patients, regardless if requested, and often in conjunction with benzodiazepines. In some instances, Christensen even asked patients directly which opioids they would prefer or provided them with a drug menu, a fact Christensen confirmed on cross-examination. Christensen never discussed warnings for taking these medications together or when to cease taking medications. Furthermore, Christensen prescribed huge quantities of opioids, far above the 40 or 50 mg per day that experts testified was the highest effective dose. In the case of Sutherland, Christensen was prescribing up to 1,000 pills at a time, with instructions to take up to 600 mg of Methadone per day, an amount that Dr. Wasan testified would never be prescribed to "someone dying of cancer in their final days." Dr. Wasan testified that Christensen's prescriptions for two of these patients was akin to giving these patients "a loaded gun" to harm or kill themselves. Meridee Lieberg, Daniel Lieberg's mother, a nurse for 47 years, testified she had never seen the quantity of prescriptions Christensen provided to Lieberg.

¶122 Patients further testified that Christensen sometimes told them where to fill prescriptions, that they often had a hard time filling prescriptions because of the quantities of drugs prescribed, and that on multiple occasions, Christensen used street slang to refer to drugs and disclosed their street value. In one case, Christensen often traded prescriptions in exchange for manual labor from a patient. Christensen provided another patient with Adderall directly on at least two separate occasions. In a third case, Christensen wrote a prescription for Adderall to a patient after she failed a urinalysis test for Adderall for which

she did not have a prescription, and otherwise did not modify her other prescriptions in any way. And one patient testified that Christensen asked her if she owed anyone Methadone.

¶123 Additionally, most patients testified that they had a history of addiction to opioids or other drugs prior to seeing Christensen. In the cases of Sutherland, Lieberg, and Griffin, Christensen knew or should have been aware that these patients were on Suboxone therapy for prior opioid addictions because they either told Christensen of their past addictions or disclosed that information to his risk assessment counselor. In the case of Philbrick, Price testified that she disclosed to Christensen her struggles with alcohol. In Jessop's case, she testified that she had track marks on her arm from past intravenous drug use. And in the case of Cummings, she testified that she told Christensen directly that she was addicted to Methadone. Nonetheless, all these patients received opioids from Christensen on the first appointment. While Christensen argues that many of these patients were dishonest with him regarding past drug abuse histories, this fact does not relieve Christensen of his duties to act in good faith within the course of a professional practice. *See Feingold*, 454 F.3d at 1010. It remains incumbent on the treating physician to utilize careful assessments and tests to determine risk factors beyond cursory conversations with patients to effectively treat patients and mitigate the risk of harm.

¶124 The State's multiple expert witnesses testified about the standard of care with which medical professionals must comply. Dr. Wasan reviewed all the medical files for Christensen as to his treatment of the eleven patients and testified that Christensen's conduct fell far below the applicable professional practice standards. Christensen failed to conduct appropriate assessments, tests and interviews, failed to conduct follow-ups, failed

to utilize treatment modalities beyond opioids, failed to utilize opioid agreements or treatment plans, and prescribed dangerous quantities of opioids and benzodiazepines without any documented reason. Even Dr. Tennant, Christensen's expert, testified that, although he believed Christensen was acting within the course of a professional practice, Christensen's care was "atrocious" and "laughable." Dr. Wasan, Dr. Ravitz, Dr. Furrow, and Dr. Bender also all testified that Christensen's medical charts were woefully inadequate, described by one expert as insufficient to pass as a second-year medical student.

¶125   Christensen argues that all eleven patients had a legitimate medical issue such that he was nonetheless acting within the course of a professional practice. However, the presence of a legitimate medical issue does not grant a physician a free pass to prescribe scheduled narcotics in any way that he or she pleases; the appropriate inquiry rests on whether the distribution of controlled substances was for a legitimate medical purpose. *Feingold*, 454 F.3d at 1010. Here, expert testimony established that Christensen's lack of appropriate assessments or follow-ups fundamentally undermined his ability to make accurate diagnoses of underlying causes of pain. Accordingly, it was reasonable for the jury to conclude that there was in fact no legitimate medical purpose for prescribing massive quantities of opioids and benzodiazepines to these patients.

¶126   Christensen further asserts that he cannot be convicted because none of the State's medical experts explicitly testified that he was acting outside the course of a professional practice and for no legitimate medical purpose, and the only expert testimony offered on the issue was his own, Dr. Tennant, who testified Christensen was acting within the course

63

of a professional practice. However, the existence of alternative interpretations of circumstantial evidence does not mean that both interpretations are equally persuasive. *Sanchez*, ¶ 17. Moreover, the jury may infer the requisite mental state from what a defendant says and does, and from all the facts and circumstances involved. Section 45-2-103(3), MCA.

¶127 Reviewing the facts in the light most favorable to the prosecution, we conclude there was overwhelming evidence for a reasonable jury to find that Christensen used his prescription writing authority as a pretext to act as a drug dealer, supporting drug tolerance or feeding addictions for all eleven patients, and that he purposely or knowingly acted outside the course of a professional practice and for no legitimate medical purpose when prescribing dangerous drugs to these patients. Accordingly, we affirm Christensen's convictions for eleven counts of Criminal Distribution of Dangerous Drugs.

¶128 *Issue Two: Whether the State proved beyond a reasonable doubt that Christensen committed Criminal Endangerment as to his treatment of nine patients.*

¶129 On January 18, 2017, Christensen filed a motion to dismiss his criminal endangerment charges, arguing that Montana's criminal endangerment statute, § 45-5-207, MCA, is unconstitutionally vague as applied because the statute does not prohibit a specific type of medical practice or specify a quantifiable amount of risk such that physicians are not provided fair notice that prescribing controlled substances could constitute conduct creating a substantial risk of death or serious bodily injury. On April 5, 2017, the District Court issued an Opinion and Order denying Christensen's motion. The court held that the statute provided sufficient notice to Christensen because the allegations assert that

64

Christensen prescribed controlled substances outside the course of a professional practice, and minimal standards are provided to those enforcing the statute.

**Discussion**

¶130  Christensen first argues that the District Court improperly denied his motion to dismiss because Montana's criminal endangerment statute is unconstitutionally vague as applied to physicians. Christensen contends that the statute uses broad, undefined terms, provides no guidelines about its application in a medical context, and fails to distinguish legal from illegal prescribing of controlled substances.

¶131 Statutes are presumed constitutional, and a party challenging a statute's constitutionality must establish beyond a reasonable doubt that the statute is unconstitutional; any doubt must be resolved in favor of the statute. *State v. Knudson*, 2007 MT 324, ¶ 12, 340 Mont. 167, 174 P.3d 469. A void for vagueness challenge to a statute may be raised on two different bases: (1) "facial," where the statute is so vague that it is rendered void on its face, or (2) "as-applied," where the statute is vague as applied to the facts of a particular situation. *Knudson* ¶ 16. A vagueness as-applied analysis has two elements: (1) whether the statute provides actual notice to citizens, and (2) and whether the statute provides minimal guidelines to govern law enforcement. *State v. Dixon*, 2000 MT 82, ¶ 28, 299 Mont. 165, 998 P.2d 544.

¶132  In determining whether a statute provides actual notice to citizens, this Court must determine whether the statute provides a person of ordinary intelligence fair notice that their contemplated conduct is forbidden. *Dixon*, ¶ 28. A statute challenged for vagueness as-applied to a particular defendant must be examined in light of the conduct with which

65

the defendant is charged in order to determine whether the defendant could have reasonably understood that his conduct was proscribed. *Knudson*, ¶ 21.

¶133 A person commits the offense of criminal endangerment when he "knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another." Section 45-5-207, MCA; *State v. Fleming*, 2019 MT 237, ¶ 13, 397 Mont. 345, 449 P.3d 1234. The criminal endangerment statute does not require the victim suffer actual physical injury, but only that the defendant engage in conduct creating a substantial risk of death or serious bodily injury. *Fleming*, ¶ 13. A person acts knowingly for the purposes of criminal endangerment when the person is aware of the high probability that the conduct in which he is engaged will cause a substantial risk of death or serious bodily injury to another. Sections 45-2-101(35), 45-5-207(1), MCA. "Conduct" is defined as "an act or series of acts and the accompanying mental state." Section 45-2-101(15), MCA.

¶134 Christensen's argument insinuates that physicians generally are not provided with fair notice because of limited definitions of terms in the statute such as "substantial risk." However, the Legislature need not define every term it employs when constructing a statute so long as the meaning of the statute is clear and provides a defendant with adequate notice of what conduct is proscribed. *State v. Nye*, 283 Mont. 505, 513, 943 P.2d 96, 101-02 (1997). And the issue is not, as Christensen contends, whether the statute fails to put any reasonable person on notice that the act of prescribing scheduled drugs in any medical practice constitutes a felony under the statute. Rather, the issue is whether Christensen could have reasonably understood that the statute prohibited *his* conduct—overprescribing and disregarding essential tests, follow-ups, and safeguards along with prescribing massive

66

amounts of dangerous prescription drugs to patients with histories of drug abuse and addiction. *See Dixon*, ¶ 29.

¶135   The statute clearly applies to Christensen such that he had actual notice that his conduct was prohibited.   First, Christensen's past conduct in Idaho, in which he overprescribed opioid and benzodiazepine medications and failed to provide appropriate tests, diagnoses, or monitoring, alerted Christensen to the fact that he should have been reasonably aware of the impropriety of his behavior, given that five of these patients died from drug overdoses, six additional patients were hospitalized, and Christensen was subject to two separate investigations and sanctions by the Idaho Board of Medicine.   Similarly, Montana's medical guidelines further exemplify the need for licensed physicians to create pain management plans, identify risks of abuse, consult past medical histories, and follow appropriate follow-up plans to effectively treat chronic pain patients with opioids.

¶136   Common sense dictates that a licensed medical doctor who has practiced for 30 years and possesses a DEA license to administer scheduled narcotics would have known the inherent risks of prescribing opioids, benzodiazepines, and numerous other Schedule II and Schedule IV controlled substances in shocking quantities and often at the same time. He demonstrated that he knew he was way out of the realm of professional medical practice by telling patients to use a Corvallis pharmacy, as other pharmacists refused to fill his prescriptions.   Despite these warnings, Christensen's conduct in Montana reflected a similar pattern of behavior as he previously exhibited in Idaho, using his practice as a cover to administer dangerous drugs, disregarding or ignoring past medical records, ignoring appropriate tests or efforts to appropriately diagnose patients' underlying cause of pain,

67

and failing to utilize important safeguards when prescribing dangerous drugs. Christensen could have reasonably understood that his conduct was proscribed such that the statute provided Christensen with actual notice.

¶137 In analyzing the second element under the void-for-vagueness doctrine—whether the statute provides minimal guidance—we consider whether the challenged statute provides an explicit standard for those who apply them, or whether the law impermissibly delegates basic policy matters to police, judges, and juries for resolution on an ad hoc and subjective basis, risking arbitrary and discriminatory application. *State v. Stanko*, 1998 MT 321, ¶ 23, 292 Mont. 192, 974 P.2d 1132. Christensen contends that there were no minimal guidelines to enforce the statute because the statute fails to distinguish legal from illegal prescribing of controlled substances and does not specify a quantifiable or understandable amount of risk. Again, we find Christensen's argument unavailing.

¶138 The inquiry is not whether the standard is imprecise, but whether there is no standard of conduct specified at all. *Monroe v. State*, 265 Mont. 1, 4, 873 P.2d 230, 231 (1994) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, n. 7, 102 S. Ct. 1186, 1191 (1982)). The statute clarifies that it only applies to conduct creating a "high probability" of a "substantial risk" of death or serious bodily injury, and must be accompanied by a requisite mental state, "knowingly," creating such a risk, thus mandating conformance to a basic, even if imprecise, standard. It is undisputed that the drugs Christensen administered to the nine patients were inherently dangerous and subject to abuse. And, in enforcing the statute, police, prosecutors, and juries must adhere to the legal requirement that a physician may only be prosecuted if he or she knowingly

68

disregards risks of abuse and nonetheless prescribes such drugs in such a manner and quantity that the risk of death or bodily injury to patients is "substantial." The Dissent essentially contends that a practicing physician can never constitutionally be prosecuted under this statute. We conclude that § 45-5-207, MCA, is not unconstitutionally vague as applied to Christensen's incredibly dangerous and unconscionable conduct. The District Court did not err in denying Christensen's motion to dismiss the criminal endangerment charges.[28]

¶139 Christensen also argues that the State presented insufficient evidence demonstrating that his conduct amounted to criminal endangerment because the State failed to prove that Christensen was aware of the high probability of the risk of death or serious bodily injury that could result from his conduct.

¶140 As already stated, Christensen cannot in good faith argue that he was not aware of the high risk of death or serious bodily injury from prescribing dangerous drugs. For a physician to prescribe dangerous drugs, such as Schedule II and Schedule IV narcotics, he or she must undergo extensive medical training and is subject to tight prescribing restrictions by both federal and state law. And Christensen himself testified that he was "more than willing" to ignore red flags like patient requests for certain drugs, that he rarely used the prescription drug registry, that he was concerned about the amount of opioids he

---

[28] The Court is mindful that physicians routinely prescribe narcotics to patients who need them—often in large quantities. We are also aware that narcotics are often liberally prescribed as palliative care. The facts here show none of these eleven patients had legitimate medical reasons for the type or quantity of narcotics they received from Christensen, and none were palliative care patients.

was prescribing to some patients but continued to prescribe the same quantities and in the same manner regardless, and that following his Idaho Board stipulations and death of Griffin in Montana, he had ample time to reevaluate his prescription writing practices. The evidence indicates that despite knowledge of the risk of death or serious bodily injury to patients, Christensen purposely chose not to modify his behavior when treating patients.

¶141 Further, extensive medical literature, including Montana's own guidelines, highlights the need for physicians to carefully follow certain assessment, follow-up, and documentation procedures to ensure that prescriptions are serving their intended purpose of treating chronic pain patients and not feeding addiction or tolerance. This literature also indicates, as referenced by numerous medical experts in the case, that opioids can cause a negative effect on the heart's electrical conduction signals, can cause a build-up over time in the patient's system, can suppress breathing, and further, that combining opioids with benzodiazepines may create toxic and deadly outcomes for patients. Without careful review of patients' medical files, psychological assessments to determine the risk for abuse, and diligent monitoring, it is evident that such prescriptions can cause harm and death. And even assuming Christensen was willfully ignorant to these standards, he was already subject to multiple investigations in Idaho for the same behaviors he exhibited in Montana.

¶142 Christensen further argues that the State did not prove that his prescribing of opioids posed a "high probability" of death or serious bodily injury to the nine surviving patients because Dr. Wasan did not offer any testimony that prescribing high doses of opioids or opioids combined with benzodiazepines posed a "high probability" of a risk of death or

70

serious bodily injury, and most of the patients who testified admitted they lied extensively to Christensen about prior addiction histories, pain needs, and addictive behaviors.

¶143 Christensen misstates the standard. In essence, Christensen's argument mirrors the erroneous proposition offered by the defendant in *Fleming*, arguing that providing opioids and benzodiazepines to patients merely creates only the "possibility" of a substantial risk of death or serious bodily injury. *See Fleming*, ¶ 20. But as we held in *Fleming*, the plain language of the criminal endangerment statute "does not require a high probability of death or serious bodily injury from the defendant's conduct, but a substantial risk to life or limb." *Fleming*, ¶ 16. The correct mental state thus requires that the defendant only "be aware of a high probability that his conduct *may* cause a substantial risk of death or serious bodily injury to another." *Fleming*, ¶ 16 (emphasis added).

¶144 Again, testimony from all nine surviving patients and numerous experts indicated that Christensen did not conduct appropriate assessments, disregarded or failed to even obtain past medical files for all nine patients, performed limited if any diagnostic tests to determine patients' sources of pain, and abjured extensive psychological assessments to accurately determine the risks of prescribing these drugs to patients. With at least two patients, he provided a list of drugs from which they could choose at their own discretion. Despite the lack of appropriate tests, Christensen prescribed opioids in obscene quantities to all nine patients on the very first visit, most of whom had extensive histories of opioid abuse. He did not provide careful monitoring or follow-ups to determine how patients would respond to drugs, but often simply refilled prescriptions. Further, expert testimony from Dr. Wasan, Dr. Farrow, Dr. Ravitz, and Dr. Bender indicated that Christensen's

71

treatment fell far below the standard of practice accepted in the medical community. It is not dispositive that the State's experts did not attempt to quantify the risk; as already stated, the existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense. Section 45-2-103(3), MCA.

¶145 While at least six of these patients testified that they were dishonest with Christensen about their pain and addiction histories, as Dr. Wasan noted, it is for the prescriber to adhere to the standards of practice in order to determine the accuracy of such statements. The mental state required to prove criminal endangerment therefore rests on Christensen's efforts to conform to standards of practice given the inherent risk of administering prescriptions for highly dangerous drugs such that a "substantial" risk of injury or death is not imparted to the patient. Given ample testimony regarding Christensen's prescribing practices, viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence from which a rational jury could find that Christensen was aware of a high probability that providing opioids, benzodiazepines, and other drugs to the nine named patients created a substantial risk of death or serious bodily injury.

¶146 *Issue Three: Whether the State proved beyond a reasonable doubt that Christensen negligently caused the deaths of Kara Philbrick and Gregg Griffin.*

¶147 On January 18, 2017, Christensen filed a motion to dismiss the negligent homicide charges. Christensen argued that nothing in the charging documents alleged any facts to indicate he was the cause-in-fact of the deaths of Philbrick and Griffin. The court denied Christensen's motion, finding that there was sufficient evidence and legal authority, relying

72

on *State v. Bier*, 181 Mont. 27, 591 P.2d 1115 (1979), such that it remained in the province of a jury to determine whether the State could prove beyond a reasonable doubt that Christensen's conduct caused the deaths of Philbrick and Griffin.

¶148 Jerry Price, Philbrick's husband, testified that Philbrick was a patient of Dr. Ravitz for three years prior to seeing Christensen. Price testified that throughout her time with Dr. Ravitz, she was drinking 2/3 of a gallon of vodka per day. Because of her alcohol abuse, Dr. Ravitz discontinued her Methadone prescription and changed her to a Fentanyl patch. Eventually, Philbrick asked Dr. Ravitz to switch her back to Methadone and increase her dosage to 80 mg per day. Dr. Ravitz declined. On March 13, 2013, two days after her last visit with Dr. Ravitz, Philbrick visited Christensen who prescribed her Methadone and Dilaudid and gave her a four-day taper off Fentanyl. Price testified that Philbrick did not provide Christensen her medical records and that Christensen only conducted a physical exam of her hand. Christensen did not utilize any blood tests or perform an EKG. On March 15, 2013, Philbrick died.

¶149 At trial, Scott Schlueter, a forensic toxicologist with the Montana crime lab testified that he examined Philbrick's blood and urine. He detected the presence of Methadone, Dilaudid, Fentanyl, Valium, Zoloft, Tramadol, and alcohol in her blood. Philbrick's prescriptions from Christensen were only for Methadone and Dilaudid. Detective Steve Deibert, a coroner with the Missoula County Sheriff's Office, testified that Philbrick's cause of death was "mixed drug toxicity," and he indicated that it was an overdose accident. He recovered 12 unaccounted-for Methadone pills and two unaccounted-for Dilaudid pills, both prescribed by Christensen, and one Fentanyl patch prescribed by Dr. Ravitz.

73

¶150  Dr. Furrow, Gregg Griffin's previous treating physician, testified that she treated Griffin with Suboxone therapy from January 2009 until February 2012, and prescribed him Zoloft for anxiety.  In 2011, Dr. Furrow testified that she referred Griffin to a psychiatric specialist to overtake Griffin's care for anxiety; the specialist prescribed Zoloft and Xanax to Griffin.  She also testified that Griffin had previously seen Christensen to obtain medical marijuana cards, issued in 2008, 2009, and 2010.  She testified that in 2008, Griffin filled out a questionnaire in Christensen's office, notifying Christensen that he was taking Suboxone.

¶151  Dr. Furrow testified that on February 22, 2012, Christensen prescribed Griffin Methadone on his first visit, and that Christensen did not contact her about Griffin.  On March 2, 2012, Christensen increased Griffin's Methadone prescription to 70 mg per day.  On March 21, 2012, Marchand evaluated Griffin, noting that Griffin posed a "high risk" for history of abuse and dependency, a "high risk" for developing problems on long-term opioid therapy, and recommended "high monitoring."  Marchand also noted that Griffin told him that "suboxone has been very helpful and he would like to discuss the use of this medication further with [Christensen]."  Griffin's mother, Sharon, also testified that Griffin was on Suboxone therapy to keep him off opioids.  She testified that on March 10, 2012, she took Griffin to the emergency room because of adverse effects from his Methadone prescription.

¶152  On March 30, 2012, Christensen issued a prescription of 200 pills of Methadone to Griffin as well as a prescription for Xanax.  Christensen did not provide an office visit but simply refilled Griffin's prescription.  Dr. Furrow testified that there were no warnings or

74

discussions with Griffin documented regarding the risks of taking his medications or a specified reason as to why he was prescribed Xanax when he was already receiving that medication from an additional provider. Dr. Furrow testified that Griffin's death could not be attributed to an "overdose" because there was no monitoring and it was irresponsible to give him this quantity of medications, particularly given his history of addiction. Sharon Griffin testified that on April 2, 2012, she found Griffin dead.

¶153 Jace Dicken, the lieutenant of patrol and chief deputy coroner for the Missoula County Sherriff's Office, testified that on April 2, 2012, he responded to a coroner call for Griffin. Dicken testified that Griffin's cause of death was listed as an "accidental overdose" from "mixed drug toxicity." Dicken also testified that 60 Methadone pills, nine Xanax pills, and ten to 20 Doxepin pills were missing from Griffin's prescription bottles. Schlueter, the toxicologist, testified that he tested Griffin's blood and urine samples which tested positive for Methadone, Xanax, Doxepin, THC, and Propranolol. Schlueter also testified that Griffin's urine test showed that he had also taken additional morphine and benzodiazepine substances not prescribed by Christensen. At the close of the State's case-in-chief and again after the close of all evidence, Christensen renewed his motions to dismiss the negligent homicide charges. The District Court denied Christensen's motions, finding that sufficient evidence was presented such that a jury could reasonably find that Christensen negligently caused the deaths of Philbrick and Griffin.

**Discussion**

¶154 Christensen argues that there was not sufficient evidence for a reasonable jury to find Christensen negligently caused the deaths of Philbrick and Griffin. A person commits

the offense of negligent homicide "if the person negligently causes the death of another human being." Section 45-5-104(1), MCA. "Negligence" is defined as follows:

> [W]hen the person consciously disregards a risk that the result will occur or that the circumstances exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves a *gross deviation* from the standard of conduct that a reasonable person would observe in the actor's situation.

Section 45-2-101(43), MCA (emphasis added).

¶155 "Gross deviation" is "a deviation that is considerably greater than lack of ordinary care." Section 45-2-101(43), MCA. A gross deviation under the statutory definition is analogous to gross negligence in the law of torts. *Bier*, 181 Mont. at 32, 591 P.2d at 1118. Although somewhat nebulous in concept, gross negligence is generally considered to fall short of a reckless disregard for consequences and is said to differ from ordinary negligence only in degree, not in kind. *Bier*, 181 Mont. at 32, 591 P.2d at 118 (citing Prosser, *Law of Torts*, 183-84 (4th Ed. 1971)).

¶156 In addition, where a crime is based on some form of negligence, the State must also demonstrate that the defendant's conduct was both the "cause-in-fact" of the victim's death and that the victim was "foreseeably endangered" in a manner and to a degree of harm which was foreseeable. *Bier*, 181 Mont. at 32-33, 591 P.2d at 1118. Conduct is a cause-in-fact of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause-in-fact of the event if the event would have occurred without it. *State ex rel. Kuntz v. Mont. Thirteenth Jud. Dist. Court*, 2000 MT 22, ¶ 37, 298 Mont. 146, 995 P.2d 951. Clearly, the risk created by Christensen's conduct under the

76

circumstances—providing large quantities of prescription drugs with no proper review of Philbrick's and Griffin's medical files, with specific knowledge that Philbrick and Griffin had a history of addiction—was foreseeable. Therefore, whether Christensen is liable for negligent homicide rests on whether he was the cause-in-fact of Philbrick's and Griffin's deaths.

¶157 We conclude that the State failed to meet its burden to prove beyond a reasonable doubt that Christensen's prescribing of dangerous drugs was the cause-in-fact of the deaths of Philbrick and Griffin. The toxicologist determined that both deaths were "accidental overdose deaths," caused from "mixed drug toxicity." Further, both Griffin and Philbrick had a mixture of legal and illegal drugs in their system, not all of which were prescribed by Christensen. And no expert testimony provided that the actual cause of death was from Methadone and benzodiazepine prescriptions written by Christensen or opined as to how each victim's combination of drugs caused their deaths.

¶158 To be sure, expert testimony is not required to prove causation in homicide cases. *See Laird*, ¶ 70. But under these facts, without more, whether Christensen's prescriptions, standing alone, caused the deaths of Philbrick and Griffin remains speculation. The State argues that Christensen's grossly negligent conduct, in which he provided Griffin and Philbrick with dangerous prescriptions, contributed directly to their deaths "as if he handed each a loaded gun." However, the evidence presented at trial does not indicate that Christensen's prescribing practices caused Philbrick and Griffin to die or that Christensen's prescriptions were the sole cause of Philbrick's and Griffin's deaths. Because there was no evidence that Christensen's negligent prescribing of dangerous drugs was the cause of

77

Philbrick's and Griffin's deaths, there was insufficient evidence to support Christensen's convictions for negligent homicide.

## CONCLUSION

¶159  For the reasons stated, Christensen's convictions for eleven counts of Criminal Distribution of Dangerous Drugs, § 45-9-101, MCA, and nine counts of Criminal Endangerment, § 45-5-207, MCA, are affirmed.  We reverse and vacate Christensen's conviction for two counts of Negligent Homicide, § 45-5-104(1), MCA, because the State did not meet its burden to demonstrate that Christensen was the cause-in-fact of the deaths of Kara Philbrick and Gregg Griffin.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA

Justice Ingrid Gustafson dissenting in part and concurring in part.

¶160  This is a classic case where bad facts make bad law.[1]  Today, the majority has basically granted prosecutors discretion to criminalize medical malpractice.  I dissent.

---

[1] It is clear Christensen is not a skilled physician who has kept abreast of evidence-based medical treatment for patients suffering from both substance use disorders and physical conditions resulting in chronic pain.  From the evidence presented at trial, he clearly committed multiple instances of malpractice related to treatment of at least eleven of his patients.  It is also clear that, prior to becoming licensed in Montana, he committed various instances of malpractice in Idaho and failed to meet standards imposed by the Idaho medical licensing board which resulted in revocation of his license to practice medicine in Idaho.  From the record before us, we do not know why, with this history, he was able to obtain a license to practice medicine in Montana or why his Montana license was not revoked or suspended sooner.  This Dissent in no way suggests Christensen provided appropriate medical treatment to the eleven patients associated with the criminal charges—it is this egregious malpractice which has unfortunately driven the Court to advance bad

78

¶161 As is abundantly clear from the Opinion's factual discussions, this is a medical malpractice case presented under the guise of criminal law. In Montana, the threshold obligation of a plaintiff in a medical malpractice case is twofold: first, evidence must be presented to establish the standard of professional care in the type of case involved; second, it must be shown the physician departed from this recognized standard in treatment of the plaintiff resulting in damage to the plaintiff. This is typically established through expert testimony because the conduct complained of is usually not readily ascertainable by a layman. *Gilkey v. Schweitzer*, 1999 MT 188, ¶ 17, 295 Mont. 345, 983 P.2d 869. The Opinion discusses the expert medical evidence provided by the State's experts to establish the standard of care for medical physicians treating pain patients including the standard for assessment, treatment plans, monitoring, and documentation and discusses how Christensen's assessment, treatment, monitoring, and documentation with regard to the representative[2] patients "fell below or far below the accepted standards of practice

---

law in this case. I take issue only with the complete inappropriateness of opening the door to criminal prosecution of licensed physicians for malpractice or criminal endangerment occurring in the course of treating patients who have presented themselves to the physician's professional practice.

[2] The Opinion conveniently ignores that the State presented these claims and patients as representative patients. The State portrayed these patients as "representative" of all of Christensen's patients and representative of his malpractice in the overall operation of his medical practice. Throughout trial, the State presented "representative" patients to present its overarching theory of the case that Christensen's medical practice was a criminal scheme to distribute dangerous drugs—his practice was to distribute "opiates on the first visit, every time" to all his patients, the only patients that went to see Christensen were addicts seeking drugs, and his practice consisted of him being nothing more than a drug pusher. Ignoring the State's theme and evidentiary presentation to justify the result is not only intellectually dishonest but erodes the credibility of this Court.

recognized in the medical community[.]" Opinion, ¶ 61. The Opinion, in essence, concludes that, despite all of Christensen's drug prescribing occurring while he was operating as a licensed physician with prescribing authority from a business office with employed professional staff, he was not conducting himself as part of a "professional practice" as his conduct did not meet accepted standards of practice—the ultimate conclusion being that when a licensed physician commits malpractice, he or she is potentially subject to criminal prosecution for that malpractice.[3] I do not believe that is what the Legislature intended when it adopted § 45-9-101(1) and (6), MCA. Further, the Opinion opens the door to physician prosecution for criminal endangerment under § 45-5-207, MCA, not necessarily limited to malpractice. I believe as-applied to physicians § 45-5-207, MCA, is unconstitutional.

*Criminal Distribution of Dangerous Drugs*

¶162 "[A] person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug[.]" Section 45-9-101(1), MCA. "Practitioners, as defined in 50-32-101, and agents under their supervision acting in the course of a professional practice are exempt from" prosecution under § 45-9-101(1), MCA. Section 45-9-101(6), MCA. Section 50-32-101(24)(a), MCA, defines "practitioner" to include "a physician . . .

---

[3] As noted in Opinion, ¶ 138 n.28, Christensen's convictions result from malpractice—failure to have legitimate medical reasons for the type and quantity of drugs prescribed. Establishing such a standard imprudently invites the State to second guess assessment and treatment provided by licensed physicians to criminalize malpractice.

licensed, registered, or otherwise permitted to distribute[ or] dispense . . . a dangerous drug in the course of professional practice . . . in this state[.]"

¶163 First, the Opinion strains logic to conclude that under § 45-9-101(1), MCA, "prescribing" fits squarely within the term "exchanges." Section 50-32-101(25) provides "'[p]rescription' means an order given individually for the person for whom prescribed directly from the prescriber to the furnisher or indirectly to the furnisher by means of an order signed by the prescriber and bearing the name and address of the prescriber, the prescriber's license classification, the name of the patient, the name and quantity of the drug or drugs prescribed, the directions for use, and the date of its issue." "Prescribing" would merely be the action of issuing a prescription. Issuing an order for a particular drug for a person to a furnisher of the drug is clearly not "[t]he act of transferring interests, each in consideration for the other"—the definition of "exchanges" provided in the Opinion. Opinion, ¶ 96.

¶164 Section 50-32-101, MCA, provides other instructive definitions and insight into legislative intent.[4] Section 50-32-101(1)(a), MCA, defines "administer" to mean "the direct application of a dangerous drug . . . by a practitioner[.]" Section 50-32-101(10), MCA, defines "dispense" as meaning "to deliver a dangerous drug to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the *prescribing* . . . [of] the drug[.]" (Emphasis added.) Section 50-32-101(11), MCA, defines

---

[4] "Whenever the meaning of a word or phrase is defined in any part of this code, such definition is applicable to the same word or phrase wherever it occurs, except where a contrary intention plainly applies." Section 1-2-107, MCA.

81

"dispenser" to mean "a practitioner who dispenses." Section 50-32-101(12), MCA, defines "distribute" to mean "to deliver other than by administering or dispensing a dangerous drug." It is clear from these definitions the Legislature did not intend to include prescribing, administering, or dispensing dangerous drugs by practitioners to be illegal conduct under § 45-9-101(1), MCA, and to the extent a prosecutor could contort the language of § 45-9-101(1), MCA, to assert otherwise, as occurred in this case, the Legislature enacted § 45-9-101(6), MCA, to prevent this. The Opinion asserts the exclusion set forth in § 45-9-101(6), MCA, has no meaning if "prescribing" is not encompassed in selling, bartering, exchanging, or giving away. Such is simply not true. In the course of a professional practice, physicians at times directly provide patients with medications. The cost of the medication and the medical treatment in administering it are generally charged to the patient. Section 45-9-101(6), MCA, exempts this type of "sale" from prosecution. Additionally, in the course of a professional practice, physicians regularly dispense medication samples to patients. Section 45-9-101(6), MCA, excludes this type of giving away from prosecution. In enacting the definitions found in § 50-32-101, MCA, the Legislature specifically labeled and defined a practitioner's actions or conduct in providing dangerous drugs to patients in the course of a professional practice, making them distinctly different than those precluded by § 45-9-101(1), MCA—"selling," "bartering," "exchanging," or "giving away."

¶165 Next, the Opinion strains logic to conclude that the exclusion from prosecution provided for in § 45-9-101(6), MCA,—specifically, the language "in the course of a professional practice"—does not apply to a physician operating as a licensed physician,

82

with State and DEA prescribing authority, from a business office with employed professional staff, but instead is a requirement the physician is to conform to the standard of care in the medical community. The Opinion concludes if the physician fails in the use of appropriate documentation, assessments, tests, follow-ups, and referrals and provides prescriptions for controlled substances in amounts exceeding the standard of care—in essence, commits malpractice—the physician is not acting in the course of a professional practice. Had the Legislature intended the exclusion to apply in situations of malpractice, the Legislature could have clearly delineated such by stating a practitioner is not exempt from prosecution if the practitioner fails to meet accepted standards of practice recognized in the medical community. It is clear from the plain language of § 45-9-101(6), MCA, the Legislature did not want the criminal justice system to second-guess a physician's decision-making made in real time while operating as a licensed physician with prescribing authority from a business office with employed professional staff, but instead left the policing of such to the physician's licensing board and/or the civil tort of medical malpractice. I would conclude § 45-9-101(6), MCA, bars prosecution of Christensen for criminal distribution of dangerous drugs based on his prescribing controlled substances to the eleven representative patients and remand for dismissal of these charges.

*Criminal Endangerment*

¶166 More egregious and alarming than upholding the criminal distribution of dangerous drug convictions, the Court dangerously upholds Christensen's criminal endangerment convictions. "A person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment."

83

Section 45-5-207, MCA. Christensen challenges his nine convictions under this statute by asserting an as-applied constitutional challenge. Christensen basically asserts there is no set of circumstances when applied to physicians under which the statute would be valid—providing sufficient notice of what conduct is violative of the statute or providing guidelines to govern law enforcement. In this circumstance, analysis under our as-applied criteria is appropriate. As the Opinion notes, an as-applied analysis involves two elements: (1) whether the statute provides actual notice of violative conduct, and (2) whether the statute provides minimal guidelines to govern law enforcement. Opinion, ¶ 131 (citing *Dixon*, ¶ 28). The Opinion concludes that since Christensen, in essence, committed malpractice—failed to conform to the standard of care for the medical profession in assessing, treating, monitoring, documenting, and prescribing prescription drugs to the representative patients—and had previously had his medical license revoked in Idaho, "he had actual notice his conduct was prohibited." Opinion, ¶ 135. The Opinion goes on to conclude that common sense dictates a physician, such as Christensen, should have known of the inherent risks of prescribing opiates and benzodiazepines together.[5] Opinion, ¶ 136. This conclusion appears absurd to me. Section 45-5-207, MCA, provides no notice to Christensen or any other physician that commission of malpractice or any other acts taken by a physician in the course of providing medical care to another will result in criminal

---

[5] While prescribing opiates and benzodiazepines together has inherent risks, similar to prescribing any other controlled medications, physicians do at times prescribe such medications together in providing care for a patient and nothing in § 45-5-207, MCA, provides notice that doing so is considered criminal conduct subject to prosecution.

liability, nor does it provide any notice that professional sanction such as license suspension or revocation, will subject him or any other physician to criminal liability. By his malpractice, Christensen was on reasonable notice he could be sued civilly by patients for medical malpractice. By his prior license and DEA prescription revocations, he was on reasonable notice that if he did not meet the requirements of the medical licensing board or DEA, his medical license and/or DEA prescription authority could be suspended or revoked. He was not reasonably on notice he was subject to criminal liability.

¶167 Section 45-5-207, MCA, as-applied to physicians, fails to provide any physician with notice as to what conduct taken in the course of the physician providing medical care to another would subject him or her to criminal prosecution. Prescribing controlled substances or performing any type of surgical procedure by their very nature create a substantial risk of death or serious bodily injury to another. This is the very reason the barriers to entry into the profession are substantial—requiring at a minimum four years of medical school, a multi-year residency, and licensing. Despite physicians giving their best efforts, some are not as skilled as others, have less experience, make mistakes, or have poor results which result in death or serious bodily injury to another. How many prescriptions constitute criminal endangerment? In what dosages? If a surgery results in an outcome which can occur but is not usually expected, is that criminal endangerment? What if a surgeon mistakenly operates on the wrong limb or removes the wrong organ, or accidentally cuts the carotid artery while performing a tonsillectomy? What if a surgery has considerable risk of death but not doing the surgery has a slightly higher risk of death? What if a surgery has considerable risk of death but could restore the patient considerable

85

function but not doing the surgery had almost no risk of death or further serious bodily injury but would result in significant ongoing functional limitation? If a physician gives a patient medication to preserve cardiac function in the setting of a heart attack but in doing so increases the patient's risk of stroke, is it criminal endangerment if the patient suffers a major stroke? And the list goes on and on. Section 45-5-207, MCA, provides no reasonable notice of what conduct, malpractice or otherwise, taken by a physician in providing medical care to another is violative of the statute.

¶168 Further, as-applied to physicians, § 45-5-207, MCA, provides no meaningful guidelines to govern law enforcement of a physician's actions in providing medical care to others. Accordingly, I would conclude § 45-5-207, MCA, as-applied to physicians, does not rationally further the intended legitimate government interest in criminalizing reckless conduct creating a risk to others and is void-for-vagueness or lack of notice and, thus, unconstitutional. I would reverse and vacate Christensen's nine criminal endangerment convictions.

*Negligent Homicide*

¶169 I concur with the Opinion's reversal and vacation of Christensen's conviction for two counts of negligent homicide.

*Other Matters*

¶170 As I would conclude § 45-9-101(6), MCA, precludes prosecution of Christensen for distribution of dangerous drugs as discussed above and that § 45-5-207, MCA, as-applied to physicians, is unconstitutional, the various evidentiary issues raised would be moot. As the Opinion inappropriately concludes otherwise, I am compelled to address at least some

of the inconsistency of the District Court and the Opinion in marshalling evidence and determining proper jury instruction.

### *Application of Feingold*

¶171 As noted in the Opinion, the State relied on a federal distribution statute—21 U.S.C. § 841(a)—and federal case law in support of its interpretation of § 45-9-101, MCA. As discussed in the Opinion, Christensen asserts the District Court improperly instructed the jury pursuant to *Feingold*, without including instruction as to the good faith defense.[6] Given the plain language of § 45-9-101(1) and (6), MCA, it is not necessary to consult *Moore* and its progeny in interpreting § 45-9-101, MCA. However, as the Opinion imposes an obligation to consult *Moore* and its progeny in interpreting § 45-9-101, MCA, and more specifically employ jury instructions consistent with *Feingold*, I address this issue. To begin, the exemption provided physicians under § 45-9-101(6), MCA, does not exist in the federal law, as such the comparison is already one of apples to oranges. To convict under § 841(a) of the CSA, the federal criminal drug distribution statute, the government must prove: "(1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to

---

[6] Christensen contests the use of federal law and *Feingold* in prosecution of Montana's criminal distribution statute. The Opinion concludes Christensen waived this argument as he did not file a brief in opposition to the State's first pretrial motion seeking an order clarifying Montana's drug distribution statute and adoption of jury instructions. At the time of the State's motion, Christensen had not yet secured legal counsel. While he did not file a brief in opposition, he requested stay of the issue until he secured legal counsel. After securing legal counsel, he filed a motion to dismiss which by its nature opposed the use of federal law in addressing Montana's criminal distribution statute. Accordingly, I would conclude he did not waive this argument for appeal.

distribute the drugs *and with intent to distribute them outside the course of professional practice*. In other words, the jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent *to act as a pusher rather than a medical professional*." *Feingold*, 454 F.3d at 1008 (first emphasis in original, second emphasis added). *Feingold* further explained, "an instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise." *Feingold*, 454 F.3d at 1010. "If a practitioner's distribution of controlled substances becomes illegal only by virtue of the fact that his actions are outside the usual course of professional practice, it follows that the practitioner must have deliberately acted in this fashion in order for him to be convicted of a crime. . . . [T]he jury *must look into a practitioner's mind to determine whether he prescribed the pills for what he thought was a medical purpose or whether he was passing out the pills to anyone who asked for them*." *Feingold*, 454 F.3d 1007-08 (emphasis added) (internal citations and quotations omitted).

¶172   As discussed in the Opinion, *Feingold* then provided a supplemental instruction regarding the good faith defense—a practitioner may not be convicted of unlawful distribution of controlled substances when he distributes controlled substances in good faith to patients in the regular course of professional practice. The good faith instruction endorsed in *Feingold* defined "in the usual course of his professional practice" as prescribed in good faith in medically treating the patient. It defined good faith in terms of sincerity of the physician in *attempting* to conduct himself in accordance with a standard of medical practice and honest effort to prescribe for a patient's condition. The good faith

88

instruction from *Feingold* further advised "practitioners who act outside the usual course of professional practice *and* prescribe or distribute controlled substances for no legitimate medical purpose may be guilty of unlawful distribution of controlled substances." *Feingold*, 454 F.3d at 1006 (emphasis added). The Opinion concludes the supplemental instruction provided here mirrored the good faith instruction of *Feingold*. I do not agree. Here, contrary to the *Feingold* good faith instruction, the good faith instruction instructed the legitimacy of the medical purpose is not determined by a practitioner's sincerity, when in part it is. Pursuant to *Feingold*, "practitioners who act outside the usual course of professional practice *and* prescribe or distribute controlled substances for no legitimate medical purpose may be guilty of unlawful distribution of controlled substances" when they have "acted not as a doctor, or even as a bad doctor, but as a 'pusher[.]'" *Feingold*, 454 F.3d at 1006-07 (emphasis added). The Opinion concludes, "[t]he jury instructions here meet the requirement for Montana law, repeating that the professional practice exemption does not apply if the defendant 'purposely or knowingly prescribes a dangerous drug for no legitimate medical purpose.'" Opinion, ¶ 108. The jury instructions here, as a whole, permitted a conviction for malpractice[7] and, unlike *Feingold,* did not instruct that the practitioner had to act not only with intent to prescribe the drugs—purposely or

---

[7] And indeed the District Court at sentencing repeatedly referred to Christensen's "careless" prescribing practices and noted Christensen's training and education was "to treat pain aggressively, and there was apparently a clear tendency in the literature to recommend that at that time" but that he "got stuck in that mindset and rejected more recent efforts over a long period of years to rein in opiate use and to advocate a stepped up approach to pain management" indicating not an intent to act as a pusher but rather malpractice in failing to stay current as to treatment modalities.

knowingly—without a legitimate medical purpose *but also with intent to act as a pusher rather than a medical professional*. As such, even if *Feingold* were applicable, the District Court erred in applying it.

### *Testimony of 28 Other Patients*

¶173 Prior to trial, the State sought, via a motion in limine, which was granted by the District Court, to preclude Christensen from presenting testimony of former patients to establish his habit and routine in treating patients. As the Opinion notes, Christensen asserted this testimony was relevant to his affirmative defense that he was prescribing drugs in the course of a professional practice and this evidence was admissible pursuant to M. R. Evid. 406, Habit and Routine Practice. The District Court and now the Opinion conclude their testimony was irrelevant as to how Christensen acted in treating "the eleven representative patients." Although the State brought eleven charges of criminal distribution of dangerous drugs in connection with eleven specific patients, the State portrayed these patients as "representative" of all of Christensen's patients and representative of his malpractice in the overall operation of his medical practice. As "representative" patients, the implication was that Christensen was operating as a "drug pusher" in the entirety of his professional practice rather than as a physician. Throughout trial, the State presented "representative" patients to present its overarching theory of the case that Christensen's medical practice was a criminal scheme to distribute dangerous drugs—his practice was to distribute "opiates on the first visit, every time" to all his patients, the only patients that went to see Christensen were addicts seeking drugs, and his practice consisted of him being nothing more than a drug pusher. Christensen sought to

90

present testimony from 28 former patients to combat the State's overarching theory of the case. Christensen asserts these patients would testify some received alternative medical treatments for pain, other than prescription opiates; some were denied prescription opiates by Christensen; some had no issues with pain and Christensen did not push pain medication on them; and some received prescription opiates, followed the prescriptions, and benefitted from the treatment without side-effects. By granting the State's motion in limine, the District Court unfairly precluded Christensen from contesting, rebutting, or correcting the State's portrayal that the medical services rendered to these eleven patients represented the malpractice Christensen's inflicted on all his patients in the overall conduct of operating his medical practice. Indeed, at sentencing when Christensen was able to present some of this evidence, the District Court noted a stark contrast to the physician the State presented at trial and the caring professional described by satisfied patients.[8]

¶174 I am concerned the Court has adopted a dangerous course of opening physicians to criminal prosecution in the setting of malpractice. Further, when claims relating to particular patients are asserted to be representative of all patients, fundamental fairness dictates such a physician should then not be hamstrung from showing a habit and practice in assessing, treating, and following-up with patients inconsistent with the claimed

---

[8] "And in this case, as much or more as any other I've had, I've been presented with two competing pictures of the Defendant that are at odds with one another. That's not uncommon in these cases, but it's probably more stark here than most. I have literally dozens of letters here from satisfied patients talking about a -- describing a doctor who is knowledgeable, caring, compassionate, unselfish, unconcerned with financial compensation to some extent; and then we have, at the same time, the doctor described at trial, who was careless in the extreme with, at least certain patients . . . ."

91

"representative" practices.  In this context the District Court erred in concluding the evidence of other patients was not relevant and not M. R. Evid. 406 habit and routine practice evidence.

/S/ INGRID GUSTAFSON

Justice Dirk Sandefur joins in the dissenting and concurring Opinion of Justice Gustafson.

/S/ DIRK M. SANDEFUR

Justice Dirk Sandefur, concurring in part and dissenting in part.

¶175   I concur in the Court's holding that the State failed to prove beyond a reasonable doubt that Dr. Christensen is guilty of negligent homicide, as more stringently defined than a mere failure to use reasonable care.  However, I join Justice Gustafson's well-reasoned dissent exposing many of the manifest technical deficiencies in the balance of the Court's reasoning.  I add the following to accentuate it.

¶176   Just as we license, pay, expect, and need them to do, Montana physicians often purposely and knowingly make medical care decisions, including the prescription of potentially dangerous drugs, that involve a substantial risk of death or serious bodily injury to patients.  They do so with the consent of their patients and in the exercise of their professional judgment, however sound, and licensed authority under state and federal law.  Until today, whether physicians acted in accordance with generally accepted medical standards, and the appropriate sanction if they did not, were questions of professional

92

licensing regulation, and well-settled civil medical malpractice law, guided by professional standards and expert medical opinion. Without prior notice to physicians, the Court's unprecedented decision now places those matters in the ill-suited hands of police, prosecutors, and sentencing judges in criminal cases, where, as here, expert medical opinion regarding the alleged breach of standard of care or resulting patient-specific medical causation of risk and harm are, at most, only secondary considerations.

¶177 Regardless of the degree of egregious or dangerous conduct at issue in a particular case, and the resulting prosecutorial and public fervor for the offending physician to be criminally punished, the irrefutable fact is that the Legislature neither designed, nor intended, Montana's current criminal endangerment and criminal distribution of dangerous drugs statutes for the prosecution of duly licensed physicians for writing ill-advised medical prescriptions to patients. Like it or not, in the current void of any applicable Montana law enacted for the purpose of criminally punishing such conduct, the problem is plainly one of public policy *for the Legislature* to prospectively address in the exercise of its exclusive constitutional authority and duty.

¶178 In the interim, this Court has no business, as it does today, leaving its constitutional lane to arbitrarily contort our existing criminal law beyond its designed and intended bounds to reach a desirable result in an undeniably troublesome case. The limited duty and authority of this Court regarding the criminal law is to correctly interpret and apply existing constitutional and statutory law as written and intended—not to make it up or reshape it as we go to address the uncontemplated urgency of the day, however serious or tragic. Medical prescriptions simply do not involve any barter, sale, or exchange of drugs *between*

*physician and patient.* They are no more than an authorization from a physician for *a patient* to legally obtain a physician-recommended drug *from a pharmacy* for medicinal purposes. The Court's unsupported, illogical, and ominous contortion of our limited criminal law can and will now be used, as here, by well-meaning but over-zealous police and prosecutors to equate a duly licensed physician's issuance of a medical prescription with an illegal drug deal on the street.

¶179  As manifest by the degree of contortion used to justify it, the Court's legally unsound, result-oriented decision is unsupported by existing Montana law and proper evidence. It will surely have untold and boundless chilling and menacing effects on the legitimate provision of essential medical care by the responsible and dedicated physicians upon whom we all so crucially depend. Hopefully, the next Legislature will, for the first time, squarely consider the problem of abusive prescription practices and revise our currently inadequate law to particularly and fairly address the problem in the public interest as deemed appropriate to protect both patients *and* physicians.

/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon, concurring and dissenting.

¶180  I join the Court's opinion on Issues One and Two. I respectfully dissent on Issue Three.

¶181  However, before turning to Issue Three, I feel compelled to address the notion that a physician who traffics in drugs is nonetheless immune from criminal liability by virtue of the "practitioner" exemption provided in § 45-9-101(6), MCA, and the existence of

94

additional civil and administrative remedies. Section 45-9-101, MCA, provides for criminal liability when "a *person* commits the offense of criminal distribution of dangerous drugs . . . ." (Emphasis added.) By its terms, § 45-9-101, MCA, reaches any "person" who knowingly and intentionally distributes dangerous drugs. The plain language of the statute sets forth a blanket prohibition on the distribution of dangerous drugs. However, the statute carves out a *limited and qualified* exemption to criminal liability for physicians who, "*in the course of a professional practice*," prescribe dangerous drugs. Section 45-9-101(6), MCA (emphasis added). The legislature could have exempted *all* physicians from criminal liability, thereby allowing for the modest penalties of state administrative and regulatory proceedings and for civil medical malpractice proceedings alone to remediate the injuries caused by drug-trafficking physicians, but it did not. Instead, the legislature chose to qualify the exemption for only legitimate physician activities. The legislature did not establish two separate and distinct penalty systems which are mutually exclusive—one for physicians and one for everyone else. There is nothing in the statutory scheme of § 45-9-101, MCA, that justifies a conclusion that a physician who acts as a drug pusher is exempt from criminal liability for distribution or the deaths of addicts simply because of his status as a physician. The qualified authorization of certain physician activities does not create a "status" of defendants who are immune from criminal prosecution. *See United States v. Moore*, 423 U.S. 122, 134, 96 S. Ct. 335, 46 L. Ed. 2d 333 (1975). Montana's legislature could hardly have deemed a medical malpractice or administrative proceeding as an appropriate resolution for the drug trafficking and deaths that have occurred here. Physicians who cease to distribute dangerous drugs as a medical

95

professional and who, instead, act as a drug pusher can be, and ought to be, prosecuted under the Statute just like any other drug pusher or *person*. *Moore*, 423 U.S. at 124, 96 S. Ct. at 337 (holding that registered physicians can be prosecuted under § 841 of the Controlled Substances Act when their activities fall outside the usual course of professional practice).

¶182 The focus of the physician exemption necessarily must be on the *legitimacy* of the *transaction*, rather than the status of the defendant. *Moore*, 423 U.S. at 134, 96 S. Ct. at 342. When a physician distributes drugs other than for a legitimate and good-faith purpose guided by the standards of the physician's medical profession, the physician is no longer entitled to the limited statutory exemption and cannot escape criminal liability. *Moore*, 423 U.S. at 135, 96 S. Ct. at 343. Physicians, who have the greatest access to controlled substances, and therefore the greatest opportunity for diversion, are not exempt from criminal liability when they traffic drugs for illegitimate purposes. Here, Christensen's distribution of drugs had no legitimate purpose and the jury concluded his distribution of drugs was outside the boundaries of any legitimate professional practice. We commit to juries the authority to make the most important decisions in our lives. Our country's judicial process is founded upon our faith that, when properly instructed and evidence properly admitted, juries will arrive at a verdict that we can adhere by. There is little doubt in my mind that juries can assess and consider whether a physician has ceased to act as a medical professional and, instead, distributed drugs as a drug pusher. I cannot subscribe to the notion that physicians are somehow above the law; are not criminally accountable for their actions conducted outside the scope of their medical

profession; or that a criminal jury trial is an inappropriate forum to evaluate their misconduct. Physicians who depart from the usual course of medical practice are subject to the same penalties as street pushers with no claim to legitimacy.

¶183   I turn now to Issue Three and whether Christensen negligently caused Gregg's and Kara's deaths.   There was, in my opinion, ample forensic evidence establishing the "but for" causation requirement for the offense of negligent homicide.  Gregg had been an addict for years.  Ignoring medical records from Gregg's prior physician, Christensen changed Gregg's treatment plan from Suboxone, which was used for addiction management, to methadone, which was used for pain management.  The toxicologist, physician, and coroners, clearly established that the presence of a "lethal" amount of methadone in Gregg's body, distributed by Christensen four days before Gregg died, was the cause-in-fact of Gregg's methadone-induced overdose death.   The amount of methadone in Gregg's body was nearly "twice the level" found in "methadone-only overdose deaths."  Additionally, there was overwhelming evidence establishing that when methadone, an opioid, is mixed with Xanax, a benzodiazepine—both of which were prescribed by Christensen and were present in Gregg's blood—the dangerous combination reduces the body's ability to sense the need to breathe and increases the likelihood of accidental overdoses.

¶184  Respecting Kara, the forensic evidence established that the drugs Christensen prescribed to her were also the cause-in-fact of her death. Following a single consultation with Christensen, Kara, who also had a severe addiction, left Christensen with a prescription allowing her to ingest lethal amounts of opioids, both methadone and Dilaudid,

and to ingest them in combination with a benzodiazepine. These opioid prescriptions from Christensen were in excess of Kara's existing prescriptions from Dr. Ravitz of fentanyl, an opioid, and Valium, a benzodiazepine. Both prescriptions from Dr. Ravitz were indicated within Kara's medical history records and were known to Christensen upon acceptance of Kara as a patient. The evidence was sufficient for the jury to conclude that Christensen was the cause-in-fact of Kara's overdose death when she was found dead three-days after her visit to Christensen.

¶185 For both Gregg's and Kara's deaths, the Court concludes that there was "mixed drug toxicity" and, for this reason, a jury could only speculate that Christensen was the cause-in-fact of their deaths. Opinion, ¶ 158. The Court's conclusion is incorrect for two fundamental reasons. First, and probably most problematic, the conclusion reached ultimately creates a status of victims—addicts—for whom physicians acting as drug pushers may escape criminal liability. An addict compulsively and habitually seeks out and abuses drugs, often many types of drugs. It can be expected that at any given point in time there likely will be more than one substance present in an addict's blood, which may have been acquired from several sources. By requiring that the drugs Christensen distributed to Gregg and Kara be the *sole* cause of their deaths, the Court immunizes the physician-drug pusher when the victim who has died, as a result of his illegal distribution of drugs, is an addict. Here, the medical evidence established that Gregg died from a lethal amount of methadone, which had been distributed by Christensen four days earlier. Christensen also distributed to Gregg a benzodiazepine, which can be lethal when mixed with methadone. It was up to a jury to decide whether either, both, or all the drugs detected

98

in Gregg's blood and distributed to him by Christensen caused his death. Similarly, Christensen distributed to Kara drugs in excess of her current prescriptions, which produced lethal amounts of opioids and benzodiazepine in her blood at the time of her death. Gregg's and Kara's severe addiction was well-known to Christensen and, in fact, it was their addictions, and that of others, that Christensen exploited in order to make money.

¶186 A physician cannot escape criminal liability on the basis that his addict-victims did what any medical professional would expect them to do; that is, taking more than directed the drug to which they are addicted, resulting in their accidental overdose death. Christensen distributed medically unsupportable dosages and amounts of drugs repeatedly to his victims, who were addicts. As a medical professional, Christensen was required to consider their addictions before prescribing drugs, just as a physician would be required to consider a patient's heart condition before prescribing certain medication. Christensen not only prescribed excessive amounts of drugs to persons whom he knew were addicts, but whom he knew were ingesting excessive amounts beyond what was directed or medically appropriate because he continued to supply refills and excessive dosages. In rendering a verdict that Christensen caused Gregg's and Kara's deaths, the jury rejected the argument that Gregg and Kara were responsible for their own deaths by taking more of the drugs than directed. The evidence of causation was neither speculative nor insufficient; to the contrary, the evidence of criminal negligence and causation was overwhelming.

¶187 Second, by requiring that Christensen's distribution of drugs to Gregg and Kara be the sole cause of their deaths, the Court incorrectly interprets the element of causation for the offense of negligent homicide. A "person commits the offense of negligent homicide

99

if the person negligently causes the death of another human being." Section 45-5-104, MCA. The jury was instructed, consistent with § 45-2-101(43), MCA, that "[a] person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously *disregards a risk that the result will occur* or that the circumstance exists or when the person *disregards a risk of which the person should be aware* that the result will occur or that the circumstance exists." Section 45-2-101(43), MCA (emphasis added). "The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. 'Gross deviation' means a deviation that is considerably greater than lack of ordinary care." Section 45-2-101(43), MCA. A gross deviation under the statutory definition is analogous to gross negligence in the law of torts. *State v. Bier*, 181 Mont. 27, 32, 591 P.2d 1115, 1118 (1979). Gross negligence is generally considered to fall short of a reckless disregard for consequences and is said to differ from ordinary negligence only in degree, not in kind. *Bier*, 181 Mont. at 32, 591 P.2d at 1118.

¶188 Section 45-2-201(1)(a), MCA, defines the causal relationship between the conduct and result: "Conduct is the cause of a result if . . . without the conduct the result would not have occurred . . . ." Where a crime is based on some form of negligence, the State must show the defendant's negligent conduct was the cause-in-fact of the victim's death. *Bowen v. State*, 2015 MT 246, ¶ 33, 380 Mont. 433, 356 P.3d 449. A party's conduct is a cause-in-fact of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not the cause-in-fact of the event if the event would have occurred without it. *Bowen*, ¶ 33. Accordingly, for Christensen to have been found

guilty of negligent homicide, the State had to prove that Gregg's and Kara's deaths would not have occurred "but for" Christensen's negligent act; that is, Christensen negligently disregarded that his distribution to addicts of an excessive amount of dangerous drugs would create a risk of drug overdose in his victims. Stated alternatively, for the jury to find Christensen *not* guilty of negligent homicide the jury would have had to conclude that Gregg and Kara would have died without Christensen's negligent act of distributing them drugs. It is hard for me to understand the Court's conclusion that the jury speculated on the element of causation because, in my opinion, the evidence does not support that Gregg and Kara would have died regardless of Christensen's conduct in distributing to them lethal amounts of drugs just prior to their deaths.

¶189 This is true particularly since the jury, during deliberations, sent a question to the court asking: "Please provide the legal definition of 'caused' as it applies to the charge of negligent homicide." The question evidences the jury's appreciation of the causation element as it relates to a negligent homicide charge, and that they understood the significance of the requirement they were tasked with deciding. In response, the District Court instructed on the statutory definition of causation, as set forth in § 45-2-201(1)(a) and (3), MCA, in the context of a negligent homicide charge:

> Conduct is the cause of a result if without the conduct the result would not have occurred.
>
> If negligently causing a particular result is an element of an offense and the result is not within the risk of which the offender is aware or should be aware, either element can nevertheless be established if the actual result involves the same kind of injury or harm as the probable result, unless the actual result is too remote or accidental to have a bearing on the offender's liability or on the gravity of the offense.

¶190   The jury considered the evidence and reached a verdict that Christensen had caused Gregg's death.  In doing so, the jury concluded that Gregg's death, only four days after Christensen distributed to him a lethal amount of methadone and benzodiazepine, would not have occurred absent Christensen's negligent conduct.  Gregg had been on a Suboxone program for his addiction for years and had not died.  After having been properly instructed on causation, the jury determined that the drugs Christensen distributed to Gregg caused his death.  Similarly, Kara had an active prescription for fentanyl, an opioid, and Valium, a benzodiazepine, from Dr. Ravitz.  Christensen knew this, but nonetheless prescribed more opioids—both methadone and Dilaudid—causing Kara's opioid levels to rise to a lethal amount—especially when ingested in combination with a benzodiazepine like Valium.

¶191   Whether Gregg's and Kara's deaths were caused by Christensen's conduct was a question for the jury to decide.  The jury was specifically instructed that to convict Christensen of negligent homicide they had to find that Christensen (1) "caused" Gregg's and Kara's deaths; and (2) that Christensen acted negligently.  The jury asked the District Court for clarification on the legal definition of causation and, in reaching a verdict that Christensen had caused Gregg's and Kara's deaths, *rejected the notion that their deaths were accidental or too remote*.  The jury was in the best position to consider the evidence and was the body charged with deciding whether Gregg's and Kara's deaths were accidental, too remote, or would have occurred regardless of Christensen's

negligent conduct. I think it is a mistake for this Court to substitute its judgment for that of the trier of fact; here, the jury.

¶192 I dissent, and I would affirm the jury's verdict that Christensen is guilty of negligent homicide for the deaths of Gregg and Kara.

/S/ LAURIE McKINNON

Justices Beth Baker and Jim Rice join in the Concurrence and Dissent of Justice McKinnon.

/S/ BETH BAKER
/S/ JIM RICE